FOR PUBLICATION

# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN
## APPELLATE DIVISION

KENRICK MAYNARD )
)
    *Appellant,* )   D.C. Crim. App. No. 2001-325
)
)   Super. Ct. Crim. No. F400/00
v. )
)
GOVERNMENT OF THE VIRGIN ISLANDS )
)
    *Appellee.* )
_____)

On Appeal from the Superior Court of the Virgin Islands
Superior Court Judge: The Honorable Rhys S. Hodge

Considered: October 30, 2008
Filed: April 17, 2009

BEFORE: **CURTIS V. GÓMEZ**, Chief Judge of the District Court of the
Virgin Islands; **RAYMOND FINCH**, Judge of the District Court of the
Virgin Islands; and **PATRICIA D. STEELE**, Judge of the Superior
Court, Division of St. Croix, sitting by designation.

ATTORNEYS:

**Ruth Miller, Esq.**
St. Thomas, U.S.V.I.
    *For the Appellant.*

**Dolace McLean, Esq.**
St. Thomas, U.S.V.I.
    *For the Appellee.*

## MEMORANDUM OPINION

**PER CURIAM,**

The appellant in this matter, Kenrick Maynard ("Maynard"), appeals his conviction in the Superior Court of the Virgin Islands[1] for first-degree murder and unauthorized possession of a firearm. For the reasons stated below, the Court will affirm Maynard's conviction on both counts.

## I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

On July 4, 1999, two cousins, Kimba George ("George") and Leslie Hyman ("Leslie" or "Leslie Hyman"), were involved in two altercations with Maynard and Maynard's brother, Ricky, at the Carnival Village on St. John, U.S. Virgin Islands. The first occurred inside the Carnival Village. The second occurred nearby, shortly after the first. After the altercations, George and Leslie boarded a ferry and returned to St. Thomas, U.S. Virgin Islands. None of the four men involved in these altercations made a police report or sought medical assistance.

At approximately midnight on July 26, 1999, Leslie was shot several times while leaving a bar in an area of St. Thomas, U.S.

---

[1] At all times relevant to this appeal, the trial court was known as the Territorial Court of the Virgin Islands and its judges were referred to as Territorial Court Judges. Effective January 1, 2005, however, the name of the Territorial Court changed to Superior Court of the Virgin Islands. *See* Act of Oct. 29, 2004, No. 6687, sec. 6, § 2, 2004 V.I. Legis. 6687 (2004). Recognizing this renaming, the Court employs the terms Superior Court and judge of the Superior Court.

Virgin Islands known as Savan. Leslie ran back to the bar and had someone there drive him to a hospital. Leslie survived the shooting. On the night of the shooting, Leslie told police that he did not know the identify of his assailant. At the trial of this matter, Leslie testified that his shooter was Maynard.

On July 28, 1999, Leslie's brother, Adolph Hyman, Jr. ("Hyman, Jr."), was walking in Savan with his father, Adolph Hyman, Sr. ("Hyman, Sr."), and Hyman, Sr.'s girlfriend, Maria Weeks ("Weeks").[2] Hyman, Sr. was living in Atlanta, Georgia but had returned to St. Thomas after learning that his son, Leslie, had been shot. Hyman, Jr. and Weeks testified that Maynard approached them[3] and began firing a weapon at Hyman, Sr. Hyman, Jr. and Weeks both ran away. Weeks attempted to hide behind a wall and saw Maynard shoot Hyman, Sr. several times while Hyman, Sr. was face down on the ground.

Virgin Islands Police Department ("VIPD") Sergeants Alva Chesterfield ("Chesterfield") and Anthony Hunt ("Hunt") arrived at the scene of Hyman, Sr.'s shooting, where they found Hyman, Sr. lying face down on the ground and observed blood and

---

[2] Weeks also referred to herself at trial as Hyman, Sr.'s wife. Hyman, Sr. and Weeks were unmarried but had resided together for some years.

[3] An individual named Baylor made some sort of signal to Maynard to indicate that Hyman, Sr., Hyman, Jr. and Weeks were nearing Maynard's position.

cartridge casings in the vicinity of the body. Weeks was interviewed at the scene and identified the body as that of Hyman, Sr. A warrant for Maynard's arrest was issued on August 5, 1999. Maynard was not immediately arrested.

At approximately midnight on January 1, 2000, VIPD Officers Miguel Perez ("Perez") and Kent Hodge ("Hodge") were on duty on St. Thomas when they heard gunshots in an area known as Hospital Ground. Perez and Hodge approached that area, where they encountered and searched several individuals. None of those individuals had any weapons on them. The officers also searched the surrounding area and, under a nearby bridge, found spent cartridges and two firearms -- an MP-45 and an AK-47 -- with several magazines. The individuals Perez and Hodge encountered were immediately arrested. The case against those individuals was later dismissed for want of evidence tying them to the AK-47.

The firearms found at Hospital Ground were submitted to the Federal Bureau of Investigation ("FBI") for forensic testing.[4] FBI firearms and tool marks examiner, Douglas Murphy ("Murphy"), tested the AK-47 recovered at Hospital Ground and the casings recovered from the scene of Hyman, Sr.'s shooting. Based on his tests, Murphy concluded that the AK-47 had discharged at least

---

[4] The spent cartridges found in the vicinity of the firearms were not submitted for forensic testing.

some of the bullets that killed Hyman, Sr. on July 28, 1999.

On October 3, 2000, acting on the August 5, 1999, warrant for Maynard's arrest, VIPD forensic investigator John R. Farrington ("Farrington") traveled to Atlanta, Georgia, where Maynard was being held in a correctional facility under the name Samuel E. Blyden.[5] Farrington escorted Maynard back to the Virgin Islands.[6]

Thereafter, in May, 2001, the appellee in this matter, the Government of the Virgin Islands (the "Government"), charged Maynard with five offenses arising out of the events described above. The first three offenses related to the July 26, 1999, shooting of Leslie Hyman. Counts One and Two of the Amended Information charged Maynard with first-degree and third-degree assault, respectively, while Count Three charged him with unauthorized possession of a firearm. The fourth and fifth offenses related to the July 28, 1999, shooting of Hyman, Sr. Count Four of the Amended Information charged Maynard with first-degree murder, while Count Five charged him with unauthorized

---

[5] The circumstances under which the VIPD learned that Maynard was in Georgia are unclear. The record reflects that law enforcement authorities in Georgia notified their counterparts in the Virgin Islands to apprise them of Maynard's presence in Georgia. The record similarly does not reflect the circumstances of Maynard's detention at a correctional facility in Georgia.

[6] Maynard waived his right to an extradition proceeding and agreed to come back to the Virgin Islands.

possession of a firearm.

After a three-day trial in September, 2001, the jury acquitted Maynard of Counts One, Two and Three and convicted him of Counts Four and Five. Maynard subsequently moved for a new trial on several grounds. That motion was denied. The trial judge sentenced Maynard to a sentence of life imprisonment for his first-degree murder conviction and three years for his conviction of unauthorized possession of a firearm.[7] This timely appeal followed.

Maynard raises four main issues for review by this Court: (1) whether the trial court erred by not dismissing the charges as a result of alleged *Brady* violations; (2) whether the trial court erred by allowing the Government's expert witness to testify about matters that were not disclosed to the defense before trial; (3) whether the trial court erred by not severing the several offenses with which Maynard was charged; and (4) whether alleged prosecutorial misconduct during closing arguments warrants a reversal of Maynard's conviction.

## II. **DISCUSSION**

### A. Jurisdiction

The Court has jurisdiction to review criminal judgments and

---

[7] The trial judge ordered both sentences to run concurrently.

orders of the Superior Court in cases in which the defendant has

been convicted, and has not entered a guilty plea. *See* V.I. CODE

ANN. tit. 4, § 33 (2006); 48 U.S.C. § 1613(a) (2006).

## B. Standard of Review

### 1. *Brady* Violation

"When a *Brady* violation is alleged[,] issues of law and fact

usually are presented. *United States v. Joseph*, 996 F.2d 36, 39

(3d Cir. 1993). "In that circumstance[,] [an appellate court]

review[s] the [trial] court's legal conclusions on a *de novo*

basis and its factual findings under the clearly erroneous

standard." *Id.; see also United States v. Perdomo*, 929 F.2d 967,

969 (3d Cir. 1991) (citing *Carter v. Rafferty*, 826 F.2d 1299,

1306 (3d Cir. 1987)). "Where the correct legal standard has been

used, 'weighing of the evidence merits deference from the

[appellate court], especially given the difficulty inherent in

measuring the effect of a non-disclosure on the course of a

lengthy trial covering many witnesses and exhibits.'" *United*

*States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006) (quoting *United*

*States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993)).

### 2. Admission of Expert Testimony

An appellate court reviews a trial court's "decisions

regarding the admission of expert testimony for abuse of

discretion." *United States v. Davis*, 397 F.3d 173, 178 (3d Cir.

2005) (citing *United States v. Watson*, 260 F.3d 301, 306 (3d Cir.

2001)). However, an appellate court exercises plenary review

over the trial court's conclusions of law. *United States v.*

*Scott*, 223 F.3d 208, 211 (3d Cir. 2000) (citing *United States v.*

*Johnson*, 199 F.3d 123, 125 (3d Cir. 1999)).

### 3. Severance

"Any improper joinder of counts under [Federal Rule of

Criminal Procedure] 8(a) raises a question on which an appellate

court's review is plenary." *United States v. Gorecki*, 813 F.2d

40, 41 (3d Cir. 1987) (citation omitted); *see also United States*

*v. McGill*, 964 F.2d 222, 241 (3d Cir. 1992) ("This court must

make an independent determination as to whether or not the

joinder of counts under . . . was improper.") (quotation marks

and citation omitted). "If the reviewing court determines that

counts have been improperly joined, it must then apply a harmless

error analysis, reversing the trial court if the misjoinder

resulted in actual prejudice to the defendant." *McGill,* 964 F.2d

at 241 (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)).

An appellate court reviews a trial court's determination as

to a request for severance pursuant to Federal Rule of Criminal

Procedure 14 for abuse of discretion. *Gorecki*, 813 F.2d at 42

("[A] defendant is required to prove that the trial court abused

its discretion in refusing to sever the counts.") (citing *United*

*States v. Sebetich*, 776 F.2d 412, 427 (3d Cir. 1985)); *United States v. Boyd*, 595 F.2d 120, 125 (3d Cir. 1978). "A claim of improper joinder under Fed. R. Crim. P. 14 must demonstrate 'clear and substantial prejudice.'" *Gorecki*, 813 F.2d at 43 (quoting *Sebetich*, 776 F.2d at 427); *see also United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991) (stating that the defendant must "demonstrate clear and substantial prejudice resulting in a manifestly unfair trial") (quotation and emphasis omitted).

## 4. Prosecutorial Misconduct

A reviewing court employs "a harmless error analysis when deciding whether a new trial is warranted because of improper remarks made by the prosecutor during closing arguments." *United States v. Gambone*, 314 F.3d 163, 177 (3d Cir. 2003) (citing *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc)). "The harmless error doctrine requires that the court consider an error in light of the record as a whole, but the standard of review in determining whether an error is harmless depends on whether the error was constitutional or non-constitutional." *Zehrbach*, 47 F.3d at 1265. "Improper conduct only becomes constitutional error when the impact of the misconduct is to distract the trier of fact and thus raise doubts as to the fairness of the trial." *Marshall v. Hendricks*, 307 F.3d

36, 67 (3d Cir. 2002) (citing *Berger v. United States*, 295 U.S.

78, 88 (1935)).  "[N]on-constitutional error is harmless when 'it

is highly probable that the error did not contribute to the

judgment.'" *Id.* (quoting *Government of Virgin Islands v. Toto*,

529 F.2d 278, 284 (3d Cir. 1976)).  "'High probability' requires

that the court possess a 'sure conviction that the error did not

prejudice' the defendant." *Id.* (quoting *United States v.*

*Jannotti*, 729 F.2d 213, 219-20 (3d Cir. 1984)).  "If the error

was constitutional, the court may affirm 'only if the error is

harmless beyond a reasonable doubt.'" *Id.* (quoting *United States*

*v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996)).

### III.  ANALYSIS

**A.  *Brady* Violation**

Maynard alleges that the Government failed to disclose

certain evidence to him before trial, as required by *Brady v.*

*Maryland*, 373 U.S. 83 (1963) and its progeny.  He argues that the

trial court erred by not dismissing the charges against him and

denying his motion for a new trial on account of the Government's

alleged failures to disclose.

In *Brady v. Maryland*, the Supreme Court held that "the

suppression by the prosecution of evidence favorable to an

accused upon request violates due process where the evidence is

material either to guilt or to punishment, irrespective of the

good faith or bad faith of the prosecution." 373 U.S. at 87.

*Brady* mandates that the prosecution provide the defense with not

only exculpatory evidence but impeachment evidence. *United States*

*v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . .

as well as exculpatory evidence, falls within the *Brady* rule.");

*Giglio v. United States*, 405 U.S. 150 (1972).

"Several prongs must be met to establish a *Brady* violation."

*United States v. Mitchell*, 365 F.3d 215, 254 (3d Cir. 2004). "To

establish a due process violation under *Brady*, . . . a defendant

must show that: (1) evidence was suppressed; (2) the suppressed

evidence was favorable to the defense; and (3) the suppressed

evidence was material either to guilt or to punishment." *United*

*States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005) (internal

quotation marks and citations omitted), *cert. denied*, 546 U.S.

1137 (2006). "This is an objective test, meaning that no

bad-faith inquiry is required." *Risha*, 445 F.3d at 303 (citing

*United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003)).

Evidence is material "if there is a reasonable probability that,

had the evidence been disclosed to the defense, the result of the

proceeding would have been different." *Bagley*, 473 U.S. at 682.

Unfortunately, the record is not pellucid with respect to

the facts surrounding either of the *Brady* items Maynard claims

went undisclosed. Nor are the parties' briefs particularly

illuminating on this point. Given this murkiness, it is necessary to reconstruct the factual backdrop of the Government's purported non-disclosures.

The first evidentiary item that Maynard claims required disclosure, is information about the individuals that Officers Perez and Hodge arrested on January 1, 2000 at Hospital Ground, where the AK-47 used in the killing of Hyman, Sr. was discovered.

After searching the individuals at Hospital Ground and finding the AK-47 nearby, Officers Perez and Hodge arrested those individuals. The Government subsequently charged the individuals with offenses relating to the AK-47. Thereafter, the Government found that it could not establish a definitive link between the individuals and the AK-47 and therefore dismissed the case against them.

After the Government charged Maynard in this matter, Maynard made repeated requests for chain of custody and trace documents regarding the AK-47. At a pretrial status conference, Maynard's counsel expressed his confusion over the origin of the AK-47, stating that he could not tell from the discovery materials provided by the Government whether the AK-47 had been recovered pursuant to a search warrant at a residence or at some other location. At that same status conference, Maynard specifically requested

> any information as to the search warrant . . . and any
> other documents concerning that firearm, including the
> names of the persons who were charged with possession
> of that firearm. . . . We understand it was recovered,
> there was an arrest of a number of individuals.  I want
> to know who was arrested for possession of that
> firearm.

[Appellant's App'x at 45-46.]  In response, the Government stated

that it had turned over to the defense a copy of the Record of

Property Received (the "RPR") from the VIPD containing chain of

custody information, that there was no further information

regarding the AK-47's chain of custody, and that the AK-47 had

not been recovered pursuant to a warrant.[8]  The trial judge

ordered the Government to respond to Maynard's request for

information pertaining to the warrant, clarifying for the

Government that Maynard "wants the names of the persons from whom

you recovered the firearm." [Appellant's App'x at 50.]  The

Government replied that it had already provided that information

in the RPR.

At trial, before the jury was called in for the parties'

opening statements, Maynard renewed his argument that he had not

_____

[8]  At the status conference, the Government stated on the
record:

> We have no further information.  [Defense counsel is]
> asking for blood out of a rock, Judge.  We just don't
> have any more information.

[Appellant's App'x at 48.]

received all trace information regarding the AK-47 and requested

anew any information pertaining to a search warrant.  The

Government again responded that the AK-47 had not been recovered

pursuant to a warrant and that the defense had received all

information in the Government's possession concerning the AK-47.

During Officer Perez's direct examination, the Government

requested that a certain document be marked for identification as

an exhibit.  At the request of the defense, the trial judge held

a conference with the parties at sidebar.  The defense renewed

its motion to dismiss, arguing that the document that had just

been marked was an RPR that the defense had never received.  This

new RPR apparently contained the names of the individuals

arrested at Hospital Ground on January 1, 2000.  The Government

replied that the new RPR had originated in an unrelated case.

The Government also stated that it was under the impression that

the earlier RPR produced to the defense was the only RPR for the

AK-47.  The earlier RPR apparently excluded the individuals'

names, but identified them by arrest number.  The Government

represented that the names of the individuals had never been

disclosed to the defense.[9]

The trial judge admonished the Government for its general

_____

[9]  Neither of the RPRs, nor any other evidence, is included
in the record on appeal.

non-responsiveness to Maynard's several discovery requests[10], but nevertheless denied Maynard's motion to dismiss, at least for the time being. The trial judge indicated that he would revisit the issue at the close of the Government's case-in-chief to determine what prejudice, if any, Maynard might suffer from the non-disclosure of the individuals' names. The trial judge also urged Maynard to investigate any information that the new RPR might furnish before the close of trial.

After the Government rested, Maynard renewed his motion to dismiss, arguing that the non-disclosure of the individuals' names precluded him from presenting evidence to the jury tying those individuals to the AK-47. Maynard insisted that the only remedy at that stage of the proceedings was dismissal, and that no other sanction could cure the non-disclosure.

---

[10] Specifically, the trial judge chided the Government for its failure to disclose the names of the individuals:

> It's probative, but you can't walk into court at the last minute and produce information that you should have produced, that the defendant asked specifically for on four different occasions, in front of me, at least, and you get up and say you didn't have it. Your problem is that you cavalierly deal with these cases as if it doesn't matter. You don't have it or produce it, and that's it. You don't seem like you think that you have to investigate. . . . And I'm getting tired of you, in particular, of these last minute, producing things.

[Appellant's App'x at 235-36.]

The Government countered that Maynard's non-disclosure

argument was a "smoke screen." According to the Government, the

RPR provided to the defense was the only one the Government

prosecutor believed to exist for the AK-47. The Government

further represented that both RPRs had "essentially the same

things, the place where the property was found, the date that it

was found, the fact that there were other people that were

arrested." [Appellant's App'x at 379.] In the Government's view,

the defense, with some diligence, could have learned any

information about the arrested individuals based on their arrest

numbers contained in the initially produced RPR.

After hearing from the parties, the trial judge considered

Maynard's renewed motion to dismiss:

> [T]he Court believes that it was negligence on the part
> of the government in not discovering this document
> before. The defendant specifically asked for this
> information, and counsel for the Government on each
> occasion . . . stood before this Court and said that he
> turned over everything, there was nothing else. It is
> clear that the document was discovered somewhere. It
> hasn't been shown where it came from at the last
> moment, but it was probably in the government's
> possession all the time. It hasn't been produced. It
> was produced in the middle of trial, and the defendant
> didn't have a chance to further investigate the named
> individuals that were listed on the document.

[*Id.* at 381.] The trial judge concluded that the Government's

failure to disclose was unintentional before addressing whether

that failure prejudiced Maynard:

> The Court finds that the defendant had all the
> information to discover those names, and based on the
> cross-examination probably knew of those named, and
> questioned the witnesses specifically as to those
> individuals, and pointed out to the jury that they
> were, in fact, arrested, and has all the information
> necessary to argue to the jury that someone else had
> that rifle.  It's the same information they would have
> had in the beginning.

[*Id.* at 382.]  Based on that reasoning, the trial judge denied

Maynard's motion to dismiss.

On appeal, Maynard raises essentially the same arguments he

raised before the trial court.  Maynard claims that the

Government's non-disclosure prevented him from investigating the

arrested individuals.  Such an investigation, Maynard asserts,

might have allowed him "to develop[] an alternative theory of the

crime that reasonably could have resulted in a different verdict

at trial." [Appellant's Br. at 17.]

The second evidentiary item on which Maynard relies to

support his *Brady* claim, is impeachment evidence regarding Weeks.

Maynard contends that the Government knew Weeks to be a drug

addict and a pathological liar, but failed to disclose that

information prior to trial.  The facts of this alleged non-

disclosure also bear reciting because of the record's disjointed

presentation.

Before trial, Maynard requested information pertaining to

Weeks' alleged eviction from her home and substance abuse.  The

Government stated at a pretrial status conference that, as far as
it knew, Weeks was not undergoing substance abuse treatment. The
trial judge instructed the Government to lodge an inquiry with
the Virgin Islands Department of Health. The Government did so,
and was apparently told that such information was confidential
and could be released only pursuant to court order. The trial
court offered its assistance in issuing such an order. There is
no indication in the record that either party sought such an
order from the trial court.

During cross-examination, the defense asked Weeks whether
she was a crack addict. Weeks responded in the negative. The
defense then asked Weeks whether she had ever used crack. The
Government objected, and a sidebar conference ensued. The trial
judge indicated that he would allow the defense to ask Weeks only
whether she had been under the influence of crack on July 28,
1999. The defense objected, claiming that Weeks was being
prosecuted by the Government for her drug use in an unrelated
case and thus was seeking to curry favor with the Government. In
essence, the defense argued that questions about Weeks' general
drug use were permissible because they could demonstrate her bias
in favor of the Government. The trial judge thereafter indicated
that the defense could ask Weeks whether a criminal case against
her was pending. When cross-examination resumed, the defense

asked Weeks that very question, to which Weeks responded

affirmatively.  Later, during the defense's case-in-chief,

Maynard testified on direct examination that he knew Weeks to be

a crack addict and had seen her use crack.

Before the defense rested and after Maynard's testimony, the

defense informed the trial judge that it had an additional

witness who had been subpoenaed but had not appeared for trial.

The defense asked for a brief continuance -- until after lunch --

to locate the witness.  The trial judge granted that request.

After lunch, the defense stated that a subpoena duces tecum had

been issued to the Department of Health for the production of any

documents concerning Weeks.  The defense further stated that an

individual at the Department of Health had told defense counsel

by telephone that no subpoena had been received and therefore

that no documents would be produced.  The defense asked the trial

judge for either an order for the Department of Health to produce

those documents or a continuance so that those documents could be

recovered.  The trial court denied both requests, stating that

there was already testimony about Weeks' drug use in the record,

that Weeks was only one eyewitness to have identified Maynard[11],

---

[11]  The trial judge stated that there were two other eye
witnesses, though the record reflects that only one other
eyewitness -- Hyman, Jr. -- testified about Maynard's having shot
Hyman, Sr.

and that the jury would be instructed to discount the credibility

of any witness who the jury believed was under the influence of

drugs during the events about which that witness testified.[12]

Thereafter, the defense rested.  Maynard was the sole defense

witness.

The issue of Weeks' alleged drug use did not arise again

until closing argument.  The defense stated that the evidence

demonstrated that Weeks was a crack addict.[13]  The Government

argued that there was no such evidence.[14]

---

[12]  Specifically, the trial judge instructed the jury as
follows:

> The testimony of someone who is shown to have used
> addictive drugs during the period of time about which
> the witness testified must always be examined and
> weighed by the jury with greater care and caution than
> the testimony of an ordinary witness.

[Appellant's App'x at 519-20.]

[13]  In its closing argument, the defense stated:

> What else do we know about Maria Weeks?  She, we submit
> the evidence is that she's a crack addict.  She bought
> crack.  Mr. Maynard said he saw her.

[Appellant's App'x at 479-80.]

[14]  In its main closing argument, the Government stated:

> How does [Maynard] get the nerve to call that woman a
> crack-head?  He has the nerve to call that woman, who
> he had just killed her husband, he is going to now
> call her a crack-head.  I spit at the idea of him
> taking that type of revenge out on this family even
> further.

In his post-verdict motion for a new trial, Maynard again raised the issue of the Government's purported non-disclosure of Weeks' drug use. Maynard pointed to the Government's motion in a case before the Family Division of the Superior Court. In that case, according to Maynard, the Government had sought to remove Weeks' children from her custody because of Weeks' drug addiction. Maynard argued that the Government, despite knowing about that case, told the jury that there was no evidence of Weeks' drug use.

Attached to Maynard's motion was one exhibit, which is included in the record in this appeal. That exhibit is captioned as a "Judgment and Order" of the Superior Court, dated April 16, 1996, and is from a custody proceeding regarding two minors. The judgment was entered following a hearing at which the Government of the Virgin Islands, Maria Weeks, and the two minors were represented by counsel. The judgment noted that Maria Weeks "has not attended narcotics anonymous meetings" and "has not reported

---

[Appellant's App'x at 457.] In its rebuttal argument, the Government stated:

> And that's the person that we're referring to as crack-head. Crack-head. The only person that said Maria Weeks is a crack-head is Kenrick Maynard. That's a heck of a thing to say about somebody. That's a heck of a thing to call a woman like that. Okay?

[*Id.* at 505.]

to see her children." [Appellant's App'x at 32.]  Among other

things, the judgment ordered the minors to remain in the custody

of the Department of Human Services and required Weeks to attend

substance abuse counseling.

At the hearing on the defense's motion for a new trial,

Maynard also presented a second exhibit, a document entitled,

"Discharge Summary."  That document is also included in the

record before this Court.  The Discharge Summary states that the

patient, identified as Maria Weekes[15], entered drug treatment on

August 8, 1996 and was discharged on December 2, 1996.  The

document further states that the patient reported an eleven-year

history of crack use and is "a pathological liar who alters the

truth to fit her needs and fantasies." [Appellant's App'x at 36.]

At the hearing on Maynard's motion, the Government

prosecutor responded that the case to which Maynard referred was

filed in the Family Division under the names of Weeks' children,

and thus that any search under Weeks' name would not have led the

prosecutor to that case.

The trial judge denied the motion for a new trial, finding

that the only pertinent question regarding Weeks' drug abuse was

whether she was under the influence of drugs on July 28, 1999,

---

[15] The spelling of Weeks' name in the Discharge Summary is
different from that in the trial transcript.

and not at any other time. The trial judge noted that Maynard

had not availed himself of the opportunity to question any law

enforcement officers who interviewed Weeks about her general

state of being or percipience immediately following the shooting.

On appeal, Maynard asserts the same arguments that he

asserted before the trial court: that the Government knew Weeks

was a drug addict because it had sought the removal of her

children in a custody proceeding. The Government, for its part,

disputes that evidence of Weeks' drug use several years before

the July 28, 1999, shooting could be used to impeach her, and

points out that testimony about Weeks' drug use was elicited at

trial in any event.

In determining whether the first *Brady* factor is attendant

-- that is, whether the Government suppressed evidence -- the

Court finds itself in a situation redolent of that in *United*

*States v. Pelullo*, 399 F.3d 197 (3d Cir. 2005). In *Pelullo*, the

defendant was convicted of various conspiracy and embezzlement

offenses. The defendant subsequently moved for a new trial on

the basis of alleged *Brady* violations. The district court

granted that motion, and the government appealed. The United

States Court of Appeals for the Third Circuit reversed, finding

that the district court had erred "in the threshold suppression

determination prescribed by the *Brady* analysis." *Id.* at 201.

The essence of the defendant's *Brady* claim in *Pelullo* was
that the government had suppressed two sets of documents. The
first set had been seized by the FBI in connection with an
investigation of the defendant in an unrelated case in another
federal jurisdiction. The defendant obtained this set of
documents through discovery in that unrelated case. The second
set originated in a civil action against the defendant. The
defendant obtained that set of documents from the Pension and
Welfare Benefits Administration (the "PWBA") after his criminal
trial under the Freedom of Information Act.

In determining whether the prosecution had suppressed the
first set of documents, the *Pelullo* Court found itself "at the
intersection between two particular branches of the *Brady*
doctrine." *Id*. at 213. The first branch holds that the
government is not obligated "to furnish a defendant with
information which he already has or, with any reasonable
diligence, he can obtain himself." *Id*. (quotation marks and
citations omitted). According to the second branch, "defense
counsel's knowledge of, and access to, evidence may be
effectively nullified when a prosecutor misleads the defense into
believing the evidence will not be favorable to the defendant."
*Id*. (citations omitted).

In reconciling these two branches of *Brady* jurisprudence,

the *Pelullo* Court weighed the prosecution's misleading statements

about the absence of exculpatory material in the first set of

documents against three factors: (1) the documents were

voluminous and belonged to the defendant; (2) the government

"lacked specific knowledge about the existence of favorable,

material evidence"; and (3) the defendant had "extended access

to, and purported knowledge of, particular documents." *Id*. The

Third Circuit explained that "defense knowledge of, or access to,

purportedly exculpatory material is potentially fatal to a *Brady*

claim, even where there might be some showing of governmental

impropriety." *Id*. at 215. The court found that the defendant

"had sufficient access to the information at issue,

notwithstanding any statements of the government, which in any

event were either discounted by the defense or were made so close

to trial as to have no practical import." *Id*. Therefore, the

court reasoned that the defendant had a duty to exercise

reasonable diligence to learn for himself what, if any,

exculpatory evidence lay in the first set of documents.

This Court is similarly confronted with the "intersection"

of the two branches of *Brady* jurisprudence that the *Pelullo* Court

described. There is little doubt that the Government prosecutor

in this matter is charged with knowledge of the custody

proceedings involving Weeks. As noted above, the Government

itself was a party in those proceedings in the same court as the

criminal proceeding against Maynard. The Government was

represented in that proceeding by a Government attorney who works

in the same office as the Government prosecutor in this matter.

The Court recognizes that the prosecutor in this matter and the

Government attorney in the custody proceeding likely work on

different matters involving different issues. Nevertheless, the

Court finds that the purpose of *Brady* and its progeny would be

seriously undermined if knowledge of material, exculpatory

evidence could not be imputed between two attorneys working for

the same sovereign in the very same office with a relatively

small number of attorneys, simply because one attorney works on

criminal matters while the other works on domestic relations

matters.[16] *See, e.g., United States v. Dimas*, 3 F.3d 1015, 1019

(7th Cir. 1993) ("Knowledge of *Brady* material may be imputed

*between prosecutors in the same office*.") (emphasis supplied;

citations omitted); *United States ex rel. Smith v. Fairman*, 769

F.2d 386, 391-92 (7th Cir. 1985) ("We believe that the purposes

_____

[16] The Government's rather lame excuse that the custody
proceeding was docketed under the names of Weeks' children, is no
excuse at all. Remarkably, in its opposition to the motion to
dismiss before the trial court, the Government prosecutor
appeared to concede that he had not even attempted to find out
about Weeks' drug use. Indeed, the prosecutor stated that the
Family Division case involving Weeks "would not have come to
light . . . *even with the exercise of due diligence*."
[Appellant's App'x at 40] (emphasis supplied).

of *Brady* would not be served by allowing material exculpatory

evidence to be withheld simply because the police, rather than

the prosecutors, are responsible for the nondisclosure."); *United*

*States v. Santos-Cruz*, Civ. No. 03-4286, 2003 U.S. Dist. LEXIS

20183, at *22 (E.D. Pa. Nov. 6, 2003) ("Knowledge of relevant

information by one prosecutor is imputed to *all other prosecutors*

*in the same office.*") (emphasis supplied; citations omitted).

Similarly, there are strong indications in the record that

the Government misled -- whether intentionally or unintentionally

-- the defense by repeatedly insisting that it had neither any

other trace information regarding the AK-47 nor knowledge of

Weeks' drug use. *See, e.g., United States v. Shaffer*, 789 F.2d

682, 690 (9th Cir. 1986) (finding that the prosecution suppressed

evidence by informing the defense of the existence of certain

tapes but indicated that those tapes would be of "no value");

*Freeman v. State of Georgia*, 599 F.2d 65, 72 (5th Cir. 1979).

Balanced against the Government's knowledge of Weeks' drug

use and misleading statements, however, is Maynard's apparent

knowledge of, and total lack of diligence in obtaining

information about, that drug use. In calculating which way the

scales tip, the Court finds guidance in *United States v. Senn*,

129 F.3d 886 (7th Cir. 1997), which the *Pelullo* Court also found

highly persuasive.

In *Senn*, the prosecution failed to disclose its key

witness's entire criminal record, which the defendants had

specifically requested.  The United States Court of Appeals for

the Seventh Circuit found no *Brady* violation notwithstanding the

defendants' reliance on the prosecution's pretrial representation

that full disclosure had been made.  The court found that the

defendants had reason to know that the government's disclosure

was not all-inclusive, could have obtained the information

themselves, and did in fact obtain that information themselves

after trial with relative ease.  In concluding that the district

court had correctly found suppression lacking, the Seventh

Circuit observed:

> [T]he government did not suppress the evidence because
> the defendants could have obtained it before trial
> through the exercise of reasonable diligence.  Thus,
> the defendants are hoisted by their own petard: without
> having obtained the Broward County file they would not
> have a *Brady* argument, but the ease with which they
> obtained that file defeats their claim.

*Senn*, 129 F.3d at 892-93.

This Court also finds *Senn*'s reasoning persuasive.  Here, it

is undisputed that the defense knew about Weeks' drug use and

even knew how to obtain information about that drug use.  At a

pretrial conference, the trial judge specifically told the

parties that such information could be procured from the

Department of Health, and offered the assistance of the court if

necessary. Furthermore, at trial, while eliciting testimony from

Weeks about her drug use, defense counsel stated as follows in

response to an objection from the Government:

> I have a good-faith basis to ask this witness that
> question. My record indicates that she was arrested
> for drug paraphernalia. I have information from my
> sources that she is a crack addict, and she has used
> crack before.

[Appellant's App'x at 201.] Maynard did in fact testify about

his personal knowledge of Weeks' drug use, even on cross-

examination:

> [Prosecutor]  Do you know Maria Weeks?
>
> [Maynard]  I know her as a crack addict in the
> neighborhood.
>
> [Prosecutor]  Oh, you know her as a crack -- how do
> you know she's a crack addict?
>
> [Maynard]  I saw her buy crack.

[*Id.* at 420.]

After Maynard testified, defense counsel asked, and was

granted, a continuance to call as a witness a Department of

Health official who had not appeared despite allegedly being

served with a subpoena. The trial judge asked the defense if it

needed the court's assistance in procuring the witness. The

defense declined that request and later rested its case of its

own accord. The defense's lack of diligence -- even after the

trial judge invited the defense to call another witness or to

present additional evidence -- also vitiates Maynard's *Brady*

claim. *See, e.g., Hughes v. Hopper*, 629 F.2d 1036, 1039 (5th Cir.

1980) (finding that because "defense counsel knew about

exculpatory or favorable information and made no effort to obtain

it, there is no violation of *Brady*") (citations omitted), *cited

with approval in Pelullo*, 399 F.3d at 213.

Finally, the trial of this matter concluded on September 26,

2001. The defense filed its motion for a new trial, accompanied

by the Superior Court's Judgment and Order discussed above, on

October 19, 2001. The hearing on the motion was held on November

13, 2001. Somehow, between the time the verdict was rendered and

the time of the motion and the hearing some three weeks and six

weeks later, respectively, Maynard was able to obtain the very

information he had repeatedly requested before trial and elected

not to present during trial. *See Senn*, 129 F.3d at 892-93.

In *Pelullo*, the Third Circuit likewise found no suppression

of the second set of documents, concluding "that the PWBA was not

a member of the prosecution team." *Pelullo*, 399 F.3d at 218. The

court specifically reasoned that "[t]here is no indication that

the prosecution and PWBA engaged in a joint investigation or

otherwise shared labor and resources." *Id.* That reasoning is

readily overlaid onto the facts of this matter. While

prosecutors certainly have "a duty to learn of any favorable

evidence known to the others acting on the government's

behalf[,]" *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), Maynard

does not contend, nor does the record reflect, that the

Department of Health in any way acted as an "arm of the

prosecutor," *see Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir.

1985) (citing *United States v. Morell*, 524 F.2d 550, 555 (2d Cir.

1975)).

Accordingly, the Court does not find that the Government

suppressed evidence of Weeks' drugs use for *Brady* purposes.[17]

---

[17] The Court notes in any event that while such evidence was
certainly favorable to Maynard, *see United States v. Smith*, 534
F.3d 1211, 1222 (10th Cir. 2008) ("[D]rug use of a witness should
be disclosed under *Brady*.") (citation omitted), its materiality
is questionable. Information withheld by the prosecution can
only be material if it "consists of, or would lead directly to,
evidence admissible at trial for either substantive or
impeachment purposes." *United States v. Phillip*, 948 F.2d 241,
249 (6th Cir. 1991). "Ordinarily, drug use is not a valid subject
for impeachment." *United States v. Arias*, 431 F.3d 1327, 1333
(11th Cir. 2005) (citation omitted). However, a witness's
consumption of alcohol or drugs at the time the witness perceived
events or while testifying may constitute impeachment evidence,
if the consumption impaired the witness's memory and perception
of the event. *See United States v. DiPaolo*, 804 F.2d 225, 229 (2d
Cir. 1986).

Here, the evidence of Weeks' drug use would very likely have
been inadmissible under Rules 404(b) and 608(b) of the Federal
Rules of Evidence. Evidence of her drug use could not have been
used to impeach her when she denied using drugs because Rule
608(b) "limits the inquiry to cross-examination of the witness .
. . and prohibits the cross-examiner from introducing extrinsic
evidence of the witness' past conduct." *United States v. Abel*,
469 U.S. 45, 55 (1984). Indeed, the defense did ask Weeks
whether she was a crack addict, and Weeks replied that she was
not. The defense would have been, and in fact was, stuck with

Similarly, the names of the individuals arrested at Hospital Ground were readily available to the defense. As the trial court noted, the RPR provided to the defense before trial was substantially similar to the new RPR introduced at trial. It is undisputed that the only material difference between the two RPRs is the exclusion of the individuals' names on the initially produced RPR. Significantly, there is also no dispute that the initially produced RPR clearly indicated that certain individuals had been arrested in connection with the AK-47. That RPR further identified those individuals by arrest number. Maynard advances no compelling reason why he was unable to learn the identities of those individuals before trial.

Furthermore, this is not a situation in which the defense learned of the withheld information -- the individuals' names -- only after the verdict. That information was disclosed during the Government's case-in-chief and became available to the defense at that time. The trial judge specifically instructed the defense to investigate, to the extent possible, any new information provided by the new RPR. Indeed, the defense used that information to its advantage by questioning Officer Perez

_____

that reply. *See United States v. Whitmore*, 359 F.3d 609, 623 (D.C. Cir. 2004) (noting that Rule 608(b) prohibits extrinsic evidence on cross-examination and thus the cross-examiner is "stuck with whatever response" the witness gives) (quoting *United States v. Brooke*, 4 F.3d 1480, 1484 (9th Cir. 1993)).

about the arrest of those individuals. Officer Perez testified

that he had indeed arrested other individuals for possession of

the AK-47. In other words, the evidence Maynard now claims was

denied to him was in fact presented to the jury. *See, e.g.,*

*United States v. Kaplan*, 554 F.2d 577, 580 (3d Cir. 1977)

(rejecting a *Brady* claim where the withheld information was

disclosed during before the prosecution rested because "the

exculpatory documents were brought to the jury's attention").

Here, as in *Kaplan*, "there is no justification for granting a new

trial so that a different jury might hear the same evidence." *Id.*

Maynard again elects not to offer any credible reason why he did

not subpoena those individuals to testify. *See United States v.*

*Smith*, 292 F.3d 90, 102-03 (1st Cir. 2002) ("The defendant must

at a minimum make a 'prima facie' showing of a plausible

strategic option which the delay foreclosed.").

Maynard's twofold *Brady* claim is undercut by his personal

knowledge of Weeks' drug use and apparent ability to act

expeditiously in obtaining direct evidence of that drug use, as

well as his knowledge that other individuals were arrested in

connection with AK-47 and his ability to elicit testimony about

those individuals. *See Senn*, 129 F.3d at 893 ("*Brady* and its

progeny do not require the government to conduct an investigation

for the defense.") (citation omitted); *United States v. White*,

970 F.2d 328, 337 (7th Cir. 1992) ("When defendants miss the exculpatory nature of documents in their possession or to which they have access, they cannot miraculously resuscitate their defense after conviction by invoking *Brady*."). In short, the Court does not find that the Government suppressed evidence within the meaning of *Brady*. Because the first *Brady* element is not attendant, the Court need not determine whether the other two elements are satisfied. *See Pelullo*, 399 F.3d at 219.

Although the Court finds that reversal is unwarranted on *Brady* grounds, the Court cannot leave this issue without emphasizing that its decision in no way is meant to condone the lackadaisical and cavalier approach to discovery of the Government prosecutor in this matter. That prosecutor appears to have ignored several specific requests from the defense for information about which the prosecutor knew or should have known, and represented to the trial court that he had turned over to the defense all information in his possession. In light of the developments during and after trial, those representations unquestionably fall short of the high standards of candor and diligence this Court expects of all prosecutors. In particular, the prosecutor's curious statement to the trial judge that he was uncertain about how to obtain a document from the Department of Health, does little to inspire confidence in those charged with

ensuring the integrity of our criminal justice system. The Court

therefore takes this opportunity to remind all prosecutors in the

Virgin Islands of their sworn duties: (1) to make timely

disclosures of constitutionally-mandated materials to criminal

defendants, and (2) to comply fully and honestly with trial court

discovery orders. The Court has serious doubts that the

prosecutor in this case complied with those elementary dictates.

## B.   Failure to Disclose Expert Testimony

Maynard contends that reversal is also justified because of

expert testimony by a Government witness introduced at trial,

allegedly in violation of Rule 16 of the Federal Rules of

Criminal Procedure.

Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure

requires the government, at the defendant's request, to disclose

"to the defendant a written summary of any [expert] testimony

that the government intends to use . . . during its case-in-chief

at trial." Fed. R. Crim. P. 16(a)(1)(G). "Although no specific

timing requirements are included, it is expected that the parties

will make their requests and disclosures in a timely fashion."

Fed. R. Crim. P. 16 advisory committee notes. If the government

fails to comply adequately with Rule 16, a new trial is warranted

only if the trial court's actions "resulted in prejudice to the

defendant." *United States v. Lopez*, 271 F.3d 472, 483 (3d Cir.

2001). "'[T]he prejudice that must be shown to justify reversal for a discovery violation is a likelihood that the verdict would have been different had the government complied with the discovery rules.'" *Id.* at 483-84 (quoting *United States v. Mendoza*, 244 F.3d 1037, 1047 (9th Cir. 2001)).

During its case-in-chief, the Government called William Anthony Fogarty ("Fogarty"), a medical examiner with the Virgin Islands Department of Justice and a laboratory director at a hospital on St. Croix, U.S. Virgin Islands. With no objection from the defense, Fogarty was qualified as an expert in forensic pathology. Fogarty testified that he had examined Hyman, Sr.'s body on July 29, 1999 at a morgue on St. Thomas. On direct examination, Fogarty testified, in relevant part, that the tracks of the bullets suggested that Hyman, Sr. had been in a prone position while his shooter stood over him. The defense objected, arguing that Fogarty's testimony in this vein was not included in the expert report disclosed before trial. The trial judge overruled the objection, noting that Weeks had already testified that Maynard was standing over Hyman, Sr. while shooting him.

The parties do not dispute that Fogarty's testimony about the likely position of Hyman, Sr.'s killer during the shooting stepped outside the bounds of Fogarty's expert report. As a result, the Court agrees that the Government failed to comply

with the requirements of Rule 16 to the letter. The inquiry, however, is whether that failure resulted in actual prejudice to Maynard. *Lopez*, 271 F.3d at 484.

Maynard does not spotlight any prejudice. Instead, Maynard's several complaints about Fogarty's testimony merely confirm what the Government appears to concede: that the Government did not fully comply with its discovery obligations. Maynard is not entitled to a new trial on that ground, however. In *Lopez*, the Third Circuit specifically rejected such an approach, reasoning that "the prejudice that must be shown to justify reversal for a discovery violation is a likelihood that the verdict would have been different had the government complied with the discovery rules." *Id.* at 483-84 (quotation omitted).

After an intensive review of the record, the Court is satisfied that Fogarty's testimony resulted in no prejudice to Maynard. First, as the trial judge correctly noted, that testimony was merely cumulative of Weeks' eyewitness testimony. *See, e.g., United States v. Messerlian*, 832 F.2d 778, 795-76 (3d Cir. 1987) (finding that an expert witness's undisclosed oral opinion did not prejudice the defendants where that opinion "was either cumulative or incredible"); *see also United States v. Garrett*, 238 F.3d 293, 300 (5th Cir. 2000) ("[N]o prejudice exists when suppressed . . . evidence is cumulative.") (citations

omitted).

Second, the purpose of Rule 16(a)(1)(G) is "to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim P. 16 advisory committee notes. Although the report provided by the Government apparently did not contain all of the detail required by Rule 16, it did put Maynard on notice about the Government's intention to call Fogarty as an expert witness and the subject of his anticipated testimony. Thus, the purpose of Rule 16 was not frustrated.

Third, the defense quite ably cross-examined Fogarty about his findings about the position of the firearm:

| [Defense Counsel] | You testified on direct that you did an examination of the tracks of the bullets, correct? |
|---|---|
| [Fogarty] | Yes. |
| [Defense Counsel] | You didn't put anything of that in your report, did you? |
| [Fogarty] | Well, what I said is that the tracks of the bullet, since they were so close together, were difficult to determine. |
| [Defense Counsel] | Of, you said "difficult to determine." |

[Appellant's App'x at 338.] The defense's effective cross-

examination of Fogarty on this issue -- which continues for some

three-and-a-half pages of trial transcript -- also militates

against a finding of prejudice. *See, e.g., United States v.*

*Shively*, 715 F.2d 260, 269 (7th Cir. 1983) ("Counsel was able to

cross-examine the expert effectively even though he lacked access

to the expert's report.").

Finally, Maynard did not request a continuance in order to

better prepare for Fogarty's cross-examination. *See, e.g., United*

*States v. Nevels*, 490 F.3d 800, 804 (10th Cir. 2007) (rejecting

the defendant's claim that he suffered prejudice from a purported

discovery violation where, *inter alia*, he "never asked for a

continuance of the trial").

Because Maynard has failed to establish any prejudice

flowing from the Government's inadequate discovery, the trial

court did not abuse its discretion in denying Maynard's request

for a new trial on this ground. *See Davis*, 397 F.3d at 178; *see*

*also United States v. Volvic*, No. 07-4705, 2008 U.S. App. LEXIS

16446, at *8-9 (3d Cir. July 31, 2008) (not precedential)

(rejecting the defendant's claim that he was prejudiced by the

government's discovery violation and could not effectively cross-

examine an expert witness where the defendant failed to explain

how the verdict would have been different).

## C.   Severance

Maynard alleges that he was prejudiced by the trial court's

denial of his motion for severance.  Before the trial

began, Maynard moved to sever the charges against him arising out

of the July 26, 1999, shooting of Leslie Hyman from the charges

arising out of the July 28, 1999, shooting of Hyman, Sr.  Maynard

asserted, for instance, that he might wish to testify about one

of the incidents and not the other.  The Government elected not

to file an opposition to the motion.  The trial court denied the

motion, finding that

> these two charges were proximately close together, one
> flows into the other, the testimony, and they all
> relate to the other.  So the Court finds that the
> interests of justice and judicial economy outweigh any
> prejudice by combining them, and will deny the motion.

[Appellant's App'x at 75-76.]

Maynard renewed his severance argument in his post-verdict

motion for a new trial, claiming that

> [t]he evidence at trial did not reveal any connection
> whatsoever with the two cases other than the tremendous
> prejudice to the defendant in having to defend two
> separate cases in one trial.  The jury was definitely
> biased against the defendant because of the joinder.
> There was no basis under Rule 8(a) for joinder.

[*Id.* at 30.]  The trial judge denied that motion as well,

reiterating its previous finding that the two events constituted

> a continuous matter. . . . [T]he jury would have to
> hear all of the evidence with respect to the incident
> in St. John.  The subsequent shooting of the son and

> the father coming to the island, they were all
> interconnected. And therefore it was in the interest
> in judicial economy to do them together. The jury
> obviously had no problems because they acquitted the
> defendant with respect to the one incident. And found
> him guilty with respect to the other.

[*Id.* at 594-95.]

On appeal, Maynard contends that the joinder of charges
relating to events on different days involving different victims
prejudiced him because the Government "was able to 'piggy back'
evidence of an altercation on St. John several weeks prior to
either alleged crime on to the back of both the case regarding
Leslie Hyman on July 26 and the murder case of July 28."
[Appellant's Br. at 23] (quotation marks in original).

"Rule 8(a) [of the Federal Rules of Criminal Procedure]
permits joinder of offenses that 'are based on the same act or
transaction or on two or more acts or transactions *connected
together or constituting parts of a common scheme or plan.*'" .
*Gorecki*, 813 F.2d at 41 (emphasis supplied). "In determining
whether two offenses . . . were properly joined, the reviewing
court [generally] must look to the indictment and not the
subsequent proof adduced at trial." *McGill*, 964 F.2d at 241
(citation omitted). "As long as the crimes charged are allegedly
a single series of acts or transactions, separate trials are not
required." *Eufrasio*, 935 F.2d at 567 (citation omitted).

In this matter, the Amended Information charged Maynard with

five offenses. Count One charged that on or about July 26, 1999,

Maynard assaulted Leslie Hyman with the intent to commit murder.

Count Two charged that on or about July 26, 1999, Maynard

assaulted Leslie Hyman with a deadly weapon. In Count Three,

Maynard was charged with unlawfully possessing a firearm on or

about July 26, 1999. Count Four alleged that on or about July

28, 1999, Maynard committed first-degree murder by shooting

Hyman, Sr. Finally, in Count Five, Maynard was charged with

unlawfully possessing a firearm on or about July 28, 1999.

On the face of the Amended Information, the charges relating

to the events of July 26, 1999 and those relating to the events

of July 28, 1999 do not appear to have any connection.

"Trial judges may look beyond the face of the indictment to

determine proper joinder in limited circumstances." *McGill*, 964

F.2d at 242. "Where representations made in pretrial documents

other than the indictment clarify factual connections between the

counts, reference to those documents is permitted." *Id.* (citation

omitted); *see also Gorecki*, 813 F.2d at 42 (finding that joinder

of firearms possession and drug charges was proper based on

"evidence" and "the record in the case").

Here, at a pretrial conference, the Government voiced its

opposition to Maynard's motion for severance, asserting that both

alleged incidents "are greatly related." [*Appellant's* App'x at

54.] The Government further argued that the incidents were charged together to show Maynard's motive. Specifically, the Government stated that those incidents all grew out of the July 4, 1999, altercation on St. John.

In *United States v. Gorecki*, 813 F.2d 40 (3d Cir. 1987), the Third Circuit did not discuss the indictment in finding that the joinder of firearms and drug offenses was not improper under Rule 8(a). *Id.* at 42. Instead, the court cited the "evidence" and "the record in this case" in reaching that finding. *Id.* Similarly, in *United States v. McGill*, 964 F.2d 222 (3d Cir. 1992), the Third Circuit pointed to the prosecution's pretrial proffer of the evidence it would adduce at trial to connect two seemingly unrelated charges. *Id.* at 242. The court found that the proffer before the trial court "adequately satisfies the 'same act or transaction' requirement . . . ." *Id.*

The record in this matter shows that the trial judge relied on the Government's pretrial, on-the-record representations that all of the offenses alleged in the Amended Information were factually connected and were charged together to show Maynard's motive. There is certainly nothing unusual in joining offenses for just such a purpose. *See, e.g., United States v. Dominguez*, 226 F.3d 1235, 1236, 1239-40 (11th Cir. 2000) (finding no error in the district court's denial of a motion for severance where

"[t]he government argued that proof of the drug-related charges

provided the motive and necessity for the mortgage fraud-related

charges"); *United States v. England*, 474 F.2d 1343, 1343 (4th

Cir. 1973) (affirming the denial of a motion for severance where

"evidence of each of [the defendant's] alleged crimes was

relevant to prove the other since each tended to demonstrate his

plan to ship contraband into the United States and his motive for

doing so, the results of which were the several crimes charged").

Thus, because each of the offenses charged was related to the

others, initial joinder of the counts was permissible under Rule

8(a). *See, e.g., United States v. Free*, 841 F.2d 321, 324 n.1

(9th Cir. 1988) (noting that joinder under Rule 8(a) was

initially proper where, "although separated by time and involving

different victims, the murder charge and the assault charges are

of same or similar character [and] "[a]ll counts charged

unjustified, premeditated acts committed by [the defendant]

himself").

"Although joinder is authorized by Rule 8(a), factual

information adduced before or during trial may indicate that

joint trial of the counts might be unfair to the defendant."

*United States v. Thomas*, 610 F.2d 1166, 1169 (3d Cir. 1979). To

avoid such unfairness, Rule 14 of the Federal Rules of Criminal

Procedure provides, in pertinent part:

> If the joinder of offenses . . . in an indictment, an
> information, or a consolidation for trial appears to
> prejudice a defendant or the government, the court may
> order separate trials of counts . . . or provide any
> other relief that justice requires.

Fed. R. Crim. P. 14(a).

The Court sees no abuse of discretion in the trial court's
determination that joinder of Maynard's offenses was consonant
with Rule 8(a)'s purpose of promoting economy of judicial and
prosecutorial resources. *See United States v. Werner*, 620 F.2d
922, 928 (2d Cir. 1980). Separate trials of the July 26, 1999,
incident and the July 28, 1999, incident would have required
duplicate testimony concerning the events of July 4, 1999. The
Government would likewise have been obligated to show that
Maynard did not have a license to possess firearms in the Virgin
Islands. To require the Government to have to prove the same
facts relating to Maynard's unauthorized possession in two
separate trials, would have been highly inefficient. *See Gorecki*,
813 F.2d at 42 ("It would have been wasteful and duplicative for
the Government to have to establish the same facts relating to
possession in two separate trials."); *United States v. Park*, 531
F.2d 754, 761 (5th Cir. 1976) (noting that "speed, efficiency,
and convenience in the functioning of the federal judicial
machinery" is to be considered in a Rule 8 inquiry).

Even if the Court concluded that the trial judge abused his

discretion in denying Maynard's motion for severance, "reversal is not required absent clear and substantial prejudice resulting in a manifestly unfair trial." *United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001) (quotation marks and citations omitted); *Eufrasio*, 935 F.2d at 568 (An appellant's burden is heavy: he must demonstrate '*clear and substantial prejudice* resulting in a *manifestly unfair trial*.'") (emphasis in original) (quoting *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981)). "It is not sufficient for [a defendant] . . . merely to allege that severance would have improved his chances for acquittal." *United States v. Sandini*, 888 F.2d 300, 307 (3d Cir. 1989). Rather, the defendant must "pinpoint[] trial prejudice caused by the joinder [he] sought to avoid." *Eufrasio*, 935 F.2d at 568 (citing *Sandini*, 888 F.2d at 305).

To the extent Maynard's claim of prejudice is based on his purported wish to testify about one of the events but not the other, the Court is singularly unpersuaded. Maynard did in fact take the stand at trial and testified about all three incidents that the Government argued took place in July, 1999. When asked on direct examination whether he had been involved in the July 4, 1999, altercation on St. John, the July 26, 1999, shooting of Leslie Hyman, or the July 28, 1999, shooting of Hyman, Sr., Maynard thrice answered, "No, sir." [Appellant's App'x at 399.]

The jury apparently discredited that testimony.

Furthermore, Maynard fails in his brief to explain what testimony he would have given with respect to one of the events and not the other if the trial court had severed the charges. Maynard's bare-bones allegation that joinder of those charges somehow had an effect on what he chose to testify about, without a specific showing as to the nature of that effect, fails to meet the strict requirements for a showing of prejudice under Rule 14.[18] *See, e.g., United States v. Montes-Cardinas*, 746 F.2d 771, 778 (11th Cir. 1984) (reasoning that a defendant who elects not to explain what testimony would have been given on either charge gives no factual basis for an evaluation of prejudice under Federal Rule of Criminal Procedure 14), *cited with approval in Gorecki*, 813 F.2d at 43; *United States v. Weber*, 437 F.2d 327,

---

[18] Indeed, Maynard's claim that he was forced to waive his right not testify about one incident because he had to testify about the other, is especially unconvincing. The record is bereft of any indication that Maynard raised this issue before the trial court by, for example, requesting the court to instruct the jury that it should not infer any guilt as a result of Maynard's failure to testify about one or several counts. As a consequence, the trial judge had no opportunity to balance Maynard's wish to testify about certain counts with the interest in trying several related counts together. Therefore, even if Maynard succeeded in showing prejudice, this Court need not consider Maynard's claim in this vein as grounds for reversal. *See, e.g., Thomas*, 610 F.2d at 1169 ("Because [the defendant] failed to present this objection in the first instance to the trial judge the person best able to weigh the competing interests at stake in a severance motion we decline to consider the point on appeal.") (citation omitted).

334 (3d Cir. 1970) (rejecting the defendant's claim that joinder

prevented him from testifying with respect to certain counts);

*United States v. Slawik*, 408 F. Supp. 190, 215 (D. Del. 1976)

(holding that the defendant's mere allegation that he wished to

testify on only certain counts was wholly insufficient to warrant

severance), *aff'd*, 564 F.2d 90 (3d Cir. 1977).

Maynard's contention that he suffered prejudice because of

what he characterizes as evidence about one incident that the

Government "piggy-backed" on the evidence about the other

incident, is unavailing for at least two reasons. First, Rule

404(b) of the Federal Rules of Evidence makes admissible

"[e]vidence of other crimes, wrongs, or acts" to show "proof of

motive, opportunity, intent, preparation, plan, knowledge,

identity, or absence of mistake or accident . . . ." Fed. R.

Evid. 404(b). As mentioned previously, the charges against

Maynard all sprang from the July 4, 1999, altercation. Thus, if

Maynard had been tried separately on the charges arising from the

July 28, 1999, incident, evidence of what occurred on July 4,

1999 and on July 26, 1999 would likely have been admissible under

Rule 404(b) to show that Maynard had knowledge of the victims and

a motive to harm them. Accordingly, Maynard's claim that he was

prejudiced by what he terms an "avalanche of unrelated evidence

in . . . the murder trial," [Appellant's Br. at 23], is of little

service to him, *see, e.g., Thomas*, 610 F.2d at 1169.

Second, "the proper question on appeal is whether the jury could have been reasonably expected to *compartmentalize the allegedly prejudicial evidence* in light of the quantity and limited admissibility of the evidence." *United States v. De Peri*, 778 F.2d 963, 984 (3d Cir. 1985) (emphasis supplied). "Prejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts . . . ." *Eufrasio*, 935 F.2d at 568.

Here, the jury acquitted Maynard of all three charges stemming from the July 26, 1999, incident and convicted him of both charges stemming from the July 28, 1999, incident. Importantly, that verdict illustrates the jury's ability to separate the evidence about the two incidents and to conduct an independent assessment of each count. *See, e.g., Thomas*, 610 F.2d at 1170 ("[T]he jurors' acquittal of [the defendant] on twenty-four of the thirty-one counts indicates that they were able to separate the evidence and decide the merits of each count independently of the others."); *United States v. Catena*, 500 F.2d 1319, 1326 (3d Cir. 1974) (finding no abuse of discretion in the trial court's denial of a motion for severance where "[t]he jury . . . was careful to convict only on [certain] counts").

In short, Maynard has fallen far short of his burden of

pointing the Court to specific instances of prejudice sufficient to justify a reversal of his conviction.[19] *See, e.g., Thomas*, 610 F.2d at 1171 (finding no error in the district court's denial of a severance motion where the defendant "has not met []his burden"); *see also United States v. Frank*, 354 F.3d 910, 920 (8th Cir. 2004) (concluding "that the evidence of prejudice and abuse of discretion adduced here by [the defendant] has not met this heavy burden"); *United States v. Cox*, 934 F.2d 1114, 1119 (10th Cir. 1991) ("Defendant's burden to show an abuse of discretion is a difficult one. He has not met this burden.") (internal citation omitted).

For the reasons set forth above, the Court holds that the trial court committed no reversible error in denying Maynard's motion to sever the charges in the Amended Information under Rules 8(a) and 14.

## D. Prosecutorial Misconduct

Maynard underscores three statements the Government made during its closing argument in support of his prosecutorial misconduct argument. According to Maynard, in making those statements, the Government "attempted to have the jury decide this case on emotion rather than facts." [Appellant's Br. at 29.]

---

[19] Indeed, Maynard limits himself to generalized allegations of prejudice in the one paragraph of his brief he dedicates to this issue.

As a result, Maynard contends that his conviction must be vacated.[20]

The first statement Maynard highlights for review was uttered during the Government's summation. While rejecting any claim that the jury should not find Maynard guilty because the AK-47 was discovered several months after the shooting of Hyman, Sr. and because the Government did not submit the casings found alongside the AK-47 for forensic testing, the Government prosecutor stated:

> And you know what? That's why the government has not proved its case beyond a reasonable doubt and that's why we should set Kenrick Maynard free. *What are you, nuts?*

[Appellant's App'x at 465] (emphasis supplied). Maynard's counsel immediately objected to the Government's "calling the jury nuts." [*Id.* at 466.] The Government and the trial judge then engaged in a brief colloquy regarding the objection:

> ATTORNEY HOLDER: Pardon me? I'm asking a rhetorical question, Judge.
>
> THE COURT: You're addressing the jurors.

---

[20] Maynard filed a post-verdict motion for a new trial, citing, *inter alia*, the Government's statement that the jury would have to be "nuts" to acquit Maynard. At a hearing immediately before sentencing, the trial judge denied that motion, noting that even though that statement was improper, it did not warrant a new trial when viewed in context. The trial judge also noted that Maynard did not request a curative instruction, but that one would have been given if such a request had been made.

> ATTORNEY HOLDER:      I am not addressing the jurors.   I
>                       am asking a rhetorical question.
>
> THE COURT:            Just argue the evidence, please.

[*Id.*]   Thereafter, the Government proceeded with its closing

argument.

The second statement the Government made during closing

argument that Maynard considers sufficiently offensive to justify

a reversal of his conviction, is the following:

> Then we have another item here that was made on January
> 1st, 2000.  This is a property receipt that is made out
> on January 1st, 2000, okay, of the finding of the AK-47
> assault rifle, the weapon that nobody belonging to any
> type of law-abiding or American organization would
> have[.]

[*Id.* at 464-65.]   Maynard immediately objected to that statement.

The trial court sustained that objection and the Government

continued its summation.

The Government uttered the third and final statement that

Maynard submits warrants a new trial while discussing Weeks'

testimony:

> How does [Maynard] get the nerve to call that woman a
> crack-head?  He has the nerve to call that woman, who
> he had just killed her husband, he is going to now call
> her a crack-head.  I spit at the idea of him taking
> that type of revenge out on this family even further.

[*Id.* at 457.]   The defense immediately raised an objection, which

the trial judge sustained.   The Government's closing argument

continued.

Maynard spends little time explaining the nature of the alleged prejudice of any of these statements. The Government apparently concedes that those statements are improper, but disputes that they worked any prejudice to Maynard. The Court need not be detained long in rejecting Maynard's contention that any of these statements, considered either individually or collectively, constitute sufficient prejudice to justify a vacatur of his conviction.

A defendant's conviction will be vacated if "the prosecutor's remarks, taken in the context of the trial as a whole, were sufficiently prejudicial to have deprived [the defendant of his] right to a fair trial." *United States v. Retos*, 25 F.3d 1220, 1224 (3d Cir. 1994) (alteration in original; citation omitted); *see also United States v. Irizarry*, 341 F.3d 273, 306 (3d Cir. 2003) ("In determining whether a prosecutor's [statement] denied the defendant a fair trial, 'it is important as an initial matter to place the remark in context' of the entire trial.") (quoting *Greer v. Miller*, 483 U.S. 756, 766 (1987)).

The Third Circuit has articulated a three-part test to determine whether improper comments are prejudicial: "the scope of the comments within the context of the entire trial, the effect of any curative instructions given, and the strength of

the evidence against the defendant." *Gambone*, 314 F.3d at 179-80

(citations omitted). "Even if a prosecutor does make an

offending statement, the district court can neutralize any

prejudicial effect by carefully instructing the jury "to treat

the arguments of counsel as devoid of evidentiary content.'" *Id.*

(quoting *United States v. Somers*, 496 F.2d 723, 738 (3d Cir.

1974)).

Applying the standards outlined above, the Court observes

that the scope of the Government's statements is relatively

narrow. The first statement was not really a statement at all.

Rather, that statement is more appropriately characterized as

precisely what the Government claimed it to be at trial: a

rhetorical device. While the use of that device, and more

particularly the use of the word "nuts," was undoubtedly

unnecessary and probably inappropriate, the Court fails to

perceive how that one statement, uttered in a fleeting moment

during the course of a long summation, could have substantially

affected the jury's deliberations. Instead, when read in context

and in light of the Government's explanation, it is clear that

the statement was meant only as a reflection of the Government's

belief that Maynard was guilty. Considering the strong evidence

of Maynard's guilt, the Court is not convinced that such a

statement was prejudicial. *See, e.g., United States v. Vitillo,*

490 F.3d 314, 326 (3d Cir. 2007) ("The prosecutor's questions, while improper, were not prejudicial in light of the overwhelming evidence of [the defendant's] guilt presented at trial.").[21]

The same may be said of the Government's second statement. While that statement perhaps inappropriately appealed to the jurors' sense of patriotism, it really did no more than reiterate what the jurors had heard at trial: that is, that Maynard did not have a license to possess the firearm that was used to kill Hyman, Sr.[22] "[P]robative evidence on the same issue as improper remarks may mitigate prejudice stemming from those remarks." *Gambone*, 314 F.3d at 179 (citing *United States v. Helbling*, 209 F.3d 226, 242 (3d Cir. 2000) ("Although the prosecutor's comments may have been a pointed assertion of Helbling's guilt, the characterizations were related to the charges contained in the indictment which the evidence presented later did in fact establish. Accordingly, we find prejudice to be lacking.")).

The scope of the third statement is similarly narrow. In

---

[21] The *Vitello* Court applied the more deferential plain error standard to determine whether the prosecutor's comments warranted a new trial, because the defendant did not object to those comments at trial. *See* 490 F.3d at 325. However, the prejudice analysis is equally applicable under the harmless error standard.

[22] At trial, Athenia Brown, a supervisor within the Firearms United of the VIPD, testified for the Government that Maynard did not have a license to carry a firearm in the Virgin Islands. [*See* Appellant's App'x at 295-98.]

that statement, the Government merely characterized evidence at trial showing that Weeks was not a crack addict. That testimony was elicited from Weeks herself on cross-examination by Maynard's counsel. Thus, like the second statement, the third statement was essentially a restatement of evidence already presented to the jury. Moreover, Maynard himself testified on direct examination that he knew Weeks to be a crack user. Given the trial judge's repeated instructions to the jurors that their recollection of the facts, and not the arguments of counsel, controlled, any harm resulting from the Government's statement about Weeks in summation could have been neutralized by Maynard's testimony to the contrary.

In sum, the Court finds that the first prejudice factor supports the Government because the three statements of which Maynard complains amount to but a few lines out of several hundred pages of trial transcript. Maynard raised on-the-spot objections to each statement, and the trial judge sustained each objection. *See, e.g., Gambone*, 314 F.3d at 180 ("[T]he prosecutor's objectionable comment amounts to less than half of a page out of over 3200 pages of trial transcript prior to jury deliberations. It represented only a fleeting moment in a four-week trial, in which the court sustained more than 200 objections by the defendant."); *Zehrbach*, 47 F.3d at 1267

("Although it is true that irreparable harm may be inflicted in a moment, the comments at issue were but two sentences in a closing argument that filled forty pages of transcript.").

Second, the trial judge gave several instructions to the jurors not to consider the arguments of counsel as evidence in their deliberations:

> Evidence of fact come from the witness stand and not from statements made by counsel. It is the answer of the witnesses that is the evidence.

[Appellant's App'x at 544.] That instruction was reinforced by another of the trial court's instructions to the jury:

> Remember, the government's claims are to be decided purely on the evidence presented, and not on your perception as to how counsel related to each other, to the witnesses or to the Court.

[*Id.* at 546.] Any remaining doubt about the jury's role was dispelled by the following instruction:

> [Y]our only concern should be a fair and impartial verdict based solely on the evidence presented in relation to the claims advanced.

[*Id.* at 547.]

The trial judge's instructions unambiguously reminded the jurors of their proper role as the sole arbiters of fact. *See, e.g., United States v. Wood*, 486 F.3d 781, 789 (3d Cir. 2007) ("Though it is true that the district court did not charge the jury with an expressly curative instruction, it did state to the jury that opening and closing statements made by counsel were not

considered evidence, and that the jury must base its verdict on only the evidence presented."), *cert. denied*, 128 S. Ct. 130 (2007). It is true that none of these instructions specifically addressed the statements Maynard challenges, and thus their capacity to blunt the effects of the Government's comments was substantially circumscribed. *See United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 287 (3d Cir. 1999) ("The instructions . . . were not [specifically] curative of the prosecutor's comment and we are not convinced that they adequately neutralized the harm caused by the prosecutor's reference . . . .") (internal citation omitted). Nevertheless, because the Court finds, as discussed above and below, that the scope of the statements is relatively narrow and the weight of the evidence against Maynard is strong, the Court does not find that the lack of a specific curative instruction compels the conclusion that a new trial is warranted. *See, e.g., Gambone*, 314 F.3d at 180 (reasoning that because the first and third factors in the prejudice inquiry favored the prosecution, "even though no specific curative instruction was provided to the jury, . . . the error was harmless beyond a reasonable doubt, and the [defendants] are not entitled to a new trial by reason of the prosecutor's comments").

Finally, even if the Government's statements in closing

argument were improper and prejudicial, the Court has little

trouble concluding that those statements did not affect the

verdict. The Court bases that conclusion on, among other things,

the eyewitness testimony of two witnesses who identified Maynard

as Hyman, Sr.'s killer, the uncontested forensic evidence linking

the firearm used to kill Hyman, Sr. with the casings discovered

at the scene of Hyman, Sr.'s shooting, and Maynard's having left

the Virgin Islands for Georgia under an assumed identity within a

few days of Hyman, Sr.'s murder. In brief, the evidence the

Government presented leaves little, if any, doubt that Maynard is

guilty of the offenses of which he was convicted. As a result,

any error wrought by the Government's improper remarks during

summation is harmless. *See United States v. Rivas*, 479 F.3d 259,

267 (3d Cir. 2007) (noting that "[a] mistrial is not required

where improper remarks were harmless, considering . . . the

strength of the evidence supporting the conviction"), *cert.*

*denied*, 128 S. Ct. 929 (2008); *Gambone*, 314 F.3d at 179-80

(finding that because the weight of the evidence against the

defendant was strong, any error resulting from the prosecutor's

improper statements was harmless); *Zehrbach*, 47 F.3d at 1267

(observing that "the extensive evidence of [the defendants']

intent to defraud supports our conclusion that the prosecutor's

remarks would not have prejudiced the jury's deliberations").

Thus, at least the first and third prejudice factors undercut Maynard's argument that he is entitled to a new trial based on the Government's improper statements during summation. Despite the absence of a specific curative instruction, the Court holds, for the reasons articulated above, that any error was harmless beyond a reasonable doubt. Accordingly, the Court need not reach whether the statements constituted constitutional or non-constitutional error, because the more stringent constitutional standard is satisfied.[23] *See, e.g., United States v. Lore*, 430 F.3d 190, 206 (3d Cir. 2005) ("[W]e are satisfied that even under the most stringent harmless error analysis, we cannot conclude that the statement to which [the defendant] points in the prosecution's opening prejudiced her."); *Gambone*, 314 F.3d at 180.

## IV. CONCLUSION

For the reasons discussed above, the Court will affirm

---

[23] By invoking the Due Process Clause, Maynard seems to assert that the Government's statements during summation rise to the level of a constitutional violation. However, even if that passing allusion to the Constitution sufficed to raise a constitutional issue, the Court has little doubt that the Government's statements, "when viewed against the backdrop of the trial as a whole," *United States v. Johnson*, 302 F.3d 139, 151 n.11 (3d Cir. 2002), did not "'so infect the trial with unfairness as to make the resulting conviction a denial of due process,'" *Greer*, 483 U.S. at 765 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Thus, under either the constitutional or non-constitutional standard, a new trial is unwarranted.

Maynard's conviction on both counts.  An appropriate judgment

follows.