NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-2273

———————

KENRICK MAYNARD,
Appellant,

v.

GOVERNMENT OF THE VIRGIN ISLANDS

———————

On Appeal from the District Court of the
Virgin Islands - Appellate Division
(D.C. No. 01-cr-325)
Chief Judge: Hon. Raymond L. Finch
District Judge: Hon. Curtis V. Gomez
Superior Court Judge: Hon. Patricia D. Steele

———————

Argued May 5, 2010

Before:  SMITH, CHAGARES and JORDAN, *Circuit Judges.*

(Filed August 25, 2010)

———————

Michael C. Quinn  [ARGUED]
Dudley, Topper & Feuerzeig
1000 Frederiksberg Gade
P.O. Box 756
St. Thomas, VI  00804
        *Counsel for Appellant*

Elliott Davis
Richard S. Davis   [ARGUED]
Joel H. Feld
Department of Justice
34-38 Kronprindsens Gade, GERS Complex, 2nd Fl.
Charlotte Amalie
St. Thomas, VI  00802
        *Counsel for Appellee*

---

## OPINION OF THE COURT

---

JORDAN, *Circuit Judge*.

Kenrick Maynard appeals from the judgment of the Appellate Division of the District Court of the Virgin Islands of the United States, which affirmed the judgment of the Superior Court of the Virgin Islands[1] sentencing him to life imprisonment following his conviction for first degree murder.  Maynard contends that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose the identities of individuals who were potentially linked to the murder weapon and the drug treatment history of a key prosecution witness.  For the reasons that follow, we will affirm.  However, we note that the prosecutor involved in Maynard's case exhibited a disturbing disregard for his obligation to respond to the defendant's production requests and that his actions should prompt the Attorney General of the Virgin Islands to undertake remedial action to prevent similar prosecutorial neglect in the future.

---

[1]The Superior Court was known as the Territorial Court of the Virgin Islands at the time of Maynard's sentencing.  For ease of reference, we identify the tribunal using its current name.

2

## I.    Background

The criminal prosecution against Maynard arises from separate incidents in which he allegedly assaulted Leslie Hyman and murdered Hyman's father, Adolph Hyman, Sr. For purposes of completeness, we will relate the facts from which all charges arise; however, the *Brady* challenges raised on appeal pertain exclusively to the murder of Adolph, Sr.[2]

### A.    *The Assault and Murder Underlying Maynard's Prosecution*

On July 4, 1999, Leslie and his cousin, Kimba George, attended the festival of Carnival[3] on the island of St. John in the United States Virgin Islands. According to both men's trial testimony, Maynard approached them at the festival and punched George twice before retreating into the crowd. Later, as Leslie and George were leaving the festival, Maynard and his brother, Ricky Kanasha,[4] again accosted them. Maynard allegedly stabbed George's hand with a six-inch blade, and George responded by wresting the weapon from Maynard's grasp, knocking him to the ground, and stabbing him four

---

[2]Because several members of the Hyman family are involved in this case, we refer to them using their first names.

[3]Carnival, as celebrated in the Virgin Islands, is not the same as the Carnival festivities that are held during the week preceding Lent in much of Catholic-influenced Latin America. The Virgin Islands Carnival, which has no religious significance, is a "cultural exposition of music, food, and festivities." (Appellee's Ans. Br. at 5.)

[4]Ricky's surname is unclear from the record. George testified that Ricky is known as Ricky Kanasha, while Leslie identified him as Ricky Maynard. For purposes of differentiating between the brothers, we refer to Kenrick as "Maynard" and Ricky as "Kanasha."

times with the same blade. As this was happening, Kanasha attempted to hit George with a chair that was sitting nearby. Leslie rushed to George's defense and stabbed Kanasha with a four-inch switchblade. The struggle then subsided, and the four men went their separate ways.

Three weeks later, on the night of July 26, 1999, Leslie was shot five times while exiting a tavern on the island of St. Thomas. He survived, and, when the police responded to the incident, Leslie informed them that he did not know who had assaulted him. At trial two years later, however, Leslie testified that Maynard was responsible for the shooting.

On July 28, 1999, two days after the tavern shooting, Leslie's father, Adolph Hyman, Sr., and his brother, Adolph Hyman, Jr., were walking along a road at night with Maria Weeks, Adolph, Sr.'s common law wife. Adolph, Sr., Weeks, and Adolph, Jr. had been stranded after their car stalled. As they walked, they observed an individual they knew only as "Baylor" signal to someone whom they could not see, and they were initially confused by the gesture. Soon after Baylor's signal, however, they saw Maynard approaching them rapidly on foot, brandishing a firearm that Adolph, Jr. described as "a big gun." (App. at 226.) All three turned and fled, and Adolph, Jr. soon pulled ahead of Adolph, Sr. and Weeks. Adolph, Jr. testified that he looked back as he ran and saw Maynard "right behind [Adolph, Sr.], shooting after him." (*Id.* at 229.) The shots passed

4

through Adolph, Sr.'s upper body, causing his shirt to become blood-stained as he ran. Adolph, Jr. then rounded a corner, which obscured the scene from his view.

Weeks corroborated Adolph, Jr.'s testimony. She explained that she was several paces behind Adolph, Sr., that she tried unsuccessfully to jump over a wall along the side of the road, and that Maynard passed her as she did so. She then mounted the wall and watched as Maynard shot the fleeing Adolph, Sr. five times in the back, eventually causing him to fall face-down on the pavement. She testified that Maynard stopped, stood over Adolph, Sr.'s body, and fired seven more shots into his back. Adolph, Sr. died as a result of the assault.

Police responded to the scene, where they recovered sixteen shell casings and a bullet, which were catalogued and retained in the police department's evidence locker. A warrant was issued for Maynard's arrest, but he was not immediately apprehended. The record contains no indication of what, if any, investigation occurred from the time of the murder until early 2000.

Within days after the fatal shooting of Adolph, Sr., Maynard fled to Atlanta, Georgia, where he assumed the name of Samuel Blyden. According to Maynard, he moved after the July 4 stabbing incident at the Carnival festival on St. John. He claimed that he never saw his attackers and did not know their identities. He also claimed to believe that fleeing under a false identity was necessary to protect his safety.

5

B.    *Discovery of the Murder Weapon*

On January 1, 2000, Virgin Islands police officers heard shots being fired in the Hospital Ground area of St. Thomas. They investigated the gunfire and apprehended six individuals (hereinafter "the January 1 arrestees") who were about to flee the scene. They also discovered several spent shell casings nearby. The individuals had no weapons in their possession, but police seized two high-caliber firearms, an AK-47 and an MP-45, which were hidden near the scene of the arrest.[5] No one had been injured by the shots, and the record contains no indication of whether any of the six arrestees were actually connected to the firearms. The arrestees were initially charged with firearms-related offenses, but those charges were later dropped because the government could not link any of them to either the AK-47 or the MP-45.

For reasons not discussed in the record, the Virgin Islands police suspected that the AK-47 may have been used in the murder of Adolph, Sr., and they submitted the gun seized on January 1 and the casings collected at the time of the murder to a firearms examiner at the Federal Bureau of Investigation. According to the examiner's trial testimony, at least ten of the casings collected at the scene of Adolph, Sr.'s murder were fired using the AK-47.

---

[5] A firearms examiner for the Federal Bureau of Investigation testified that one of the firearms was technically a Mac-90, which is a civilian version of the better known AK-47. However, the parties described the gun as an AK-47 at trial and in briefing submitted to our court. We adopt the parties' convention of referring to the weapon as an AK-47, even though that description appears to be technically incorrect.

C.    *Prosecution of Maynard*

The discovery of the AK-47 prompted police to devote renewed attention to the warrant for Maynard's arrest, which remained outstanding.  Through means not described in the record, police discovered that Maynard had fled to Atlanta, and they filed a request for extradition with Georgia state authorities, who apprehended him.  Maynard voluntarily agreed to be extradited to the Virgin Islands, where he was charged with assault in connection with the shooting of Leslie and with first degree murder in connection with the death of Adolph, Sr.

1.    *Pretrial Proceedings*

During the final pretrial conference on September 10, 2001, Maynard's attorney requested disclosure of two pieces of information.  First, Maynard requested disclosure of the names of the January 1 arrestees.  As part of the government's pretrial disclosures, the prosecution had given Maynard several documents that identified the arrestees using arrest numbers rather than their names.  The prosecutor, Assistant Attorney General Lofton Holder, represented that the arrestees' names were in a document listing property seized during the arrest.  The prosecutor further stated that the document with the names had already been provided to the defense.  He said that the government "ha[d] no further information" and that defense counsel was "asking for blood out of a rock." (*Id.* at 106.) Maynard contends – and the government does not now dispute – that the arrestees' identities did not, in fact, appear in that document.

7

Second, Maynard was aware from personal knowledge that Weeks had a history of using crack cocaine, and defense counsel requested any records in the government's possession regarding Weeks's drug use or treatment. The prosecutor responded that he had "no knowledge" of any such information. (*Id.* at 108.) Defense counsel asked the government to check for records about Weeks with the Mental Health and Substance Abuse Clinic, a division of the Virgin Islands Department of Health. Two days later, the prosecutor responded that he had contacted the clinic but that, without a court order, clinic personnel would not discuss whether records existed for Weeks. Neither party requested any such court order, and the prosecutor did not take any other steps to obtain the records.

2.    *Trial*

Trial commenced in the Superior Court on September 24, 2001. Maynard renewed both of his disclosure requests in advance of opening statements to the jury. With respect to the identities of the January 1 arrestees, the prosecutor said, "I have provided counsel with all of the documents in my possession with reference to the recovery of t[he] weapon," and he went on to assert that none of those documents contained the identity of the arrestees.[6] (*Id.* at 128.) He also reiterated that he had contacted the Substance Abuse Clinic but could not obtain Weeks's treatment records without a court order. Trial then began.

_____

[6]That assertion was manifestly inconsistent with the prosecutor's statement before trial that the names had already been provided to the defense in an inventory document.

Following the lunch recess that same day, the government called as a witness

Officer Miguel Perez, who had investigated the January 1, 2000 shooting incident

involving the AK-47 and the MP-45. During Perez's testimony, the government sought

to admit a document that was part of the chain of custody for the AK-47 and that

contained the names of the six January 1 arrestees. Maynard objected to the report on the

basis that the government had not disclosed the arrestees' names despite several pretrial

requests. When the Court asked the government to explain the sudden discovery of the

names, the prosecutor stated that the chain-of-custody records in Maynard's case file did

not contain those names and that the document that did have the names came from a file

in a separate case.[7] The prosecutor indicated that he considered the January 1 arrests to

be "unrelated" to Maynard's case and that he believed he had produced all relevant

documents associated with the charges against Maynard. (*Id.* at 281.) He further

explained that he had first learned of the document at issue from an unidentified

individual in the prosecutor's office during the lunch recess.

Maynard moved to dismiss, arguing that the government's late production of the

document violated its disclosure obligations under *Brady* because the arrestees were

potentially connected to the weapon used to kill Adolph, Sr. Maynard speculated that,

had he known their names prior to trial, he could have interviewed the arrestees and might

---

[7]The record does not identify whether the document appeared in a file associated with
the January 1 arrests, or with another unidentified case. For our purposes, we note only
that, whatever the purpose of the file, it was clearly related to the seizure of the AK-47
and contained documents associated with the arrestees' being taken into custody.

have been able to link one of them to the weapon or to the murder. The prosecutor opposed the motion to dismiss on the basis that the names of the arrestees were not relevant and that, even if the arrestees possessed exculpatory information, Maynard had suffered no prejudice because defense counsel still "ha[d] ample opportunity to [investigate them during trial because w]e're still on the Government's case." (*Id.* at 292.) The Court expressed indignation with that suggestion and asked: "When should he do that? ... [Y]ou want me to break now and send [defense counsel] off?" (*Id.*) The prosecutor responded by saying, "[i]f [defense counsel] wants to investigate [the arrestees], I think he should get started now." (*Id.*). The Court chastised the prosecutor for the belated production but denied Maynard's motion and indicated that it would reconsider the issue at the close of the government's case.

The government's direct examination of Perez continued, during which the officer described the circumstances leading to the January 1 arrests. On cross examination, Maynard's counsel elicited the names of the six arrestees and moved the newly produced report into evidence. At the close of the government's case, Maynard renewed his motion to dismiss. The Court denied the motion on the basis that he could have investigated the individuals after the first day of trial and that he was able to encourage jurors to infer that one of the arrestees was linked to the firearm. During closing argument, Maynard's counsel urged the jury to draw such an inference, thereby discrediting the government's theory that Maynard was responsible for the murder of Adolph, Sr.:

10

But we know, do we not, that somebody else other than Kenrick Maynard possessed that gun, because on January 1st, 2000, there was a shooting ... .

* * *

[The police] arrested ... Jose Hodge, Antonio Benjamin, Sherman Louis, Kareem George, Naja Adams and Kwasi Adams[] for possession of that same firearm, the gun that was used to kill Adolph Hyman.

* * *

And you can use that against the government, because it shows that somebody else, other than Kenrick Maynard, possessed that firearm that shot Adolph Hyman, ... Sr.

(*Id.* at 546-47.)

The issue regarding Weeks's drug treatment also came up during trial. The morning the trial began, the prosecutor reiterated that a court order was required to obtain Weeks's drug treatment records. Defense counsel then served a subpoena on the Department of Health demanding production of those records. The Department responded to the subpoena the next day, but, because the trial lasted only a day and a half, the records did not arrive at the courthouse until the Court had already closed the evidentiary record and submitted the case to the jury. The records of Weeks's treatment, which dated from 1996, revealed that she had an eleven-year history of addiction to crack cocaine and that therapists had characterized her as a "pathological liar who alters the truth to fit her needs and fantasies" in order to obtain crack cocaine or to conceal her drug use. (*Id.* at 636.) Maynard requested that the Court reopen the evidence and allow him to submit the records to the jury, but the Court refused.

11

D.    *Post-Trial Proceedings*

The jury returned a verdict finding Maynard guilty of the murder of Adolph

Hyman, Sr., but acquitting him of the assault on Leslie Hyman. Thereafter, Maynard

made an oral motion for judgment of acquittal, arguing that the government's failure to

disclose the arrestees' identities and the information concerning Weeks's drug treatment

violated *Brady*. The Court ordered briefing on the motion and indicated that it would

hear oral argument approximately one month later, at the time of Maynard's sentencing

hearing. The record contains no indication that Maynard made any effort prior to

sentencing to locate the January 1 arrestees or to show what, if any, information they

possessed about the firearm.

At sentencing, the Superior Court denied the motion on the ground that the

government had not suppressed the names of the January 1 arrestees because it had

disclosed them before the completion of trial, and that those identities were available to

the defense prior to trial because Maynard could have discovered their names by

contacting the law enforcement personnel who handled the arrests. Similarly, the Court

concluded that the records of Weeks's drug treatment were not suppressed by the

government because the defense could have obtained them by serving a subpoena before

trial. Alternatively, the Court found that those records were not material to Maynard's

case because they were over five years old and shed no light on whether Weeks was under

the influence of crack cocaine at the time of her testimony.

12

Maynard filed a timely appeal to the Appellate Division of the District Court. The Appellate Division affirmed for the same reasons cited by the Superior Court in denying Maynard's motion for judgment of acquittal. Maynard then filed the present appeal.

## II.    Jurisdiction and Standard of Review

The Superior Court had jurisdiction over Maynard's criminal case pursuant to 48 U.S.C. § 1611(b) and V.I. CODE ANN., tit. 4, § 76(b). The Appellate Division had jurisdiction to hear appeals from the final judgment of the Superior Court under 48 U.S.C. § 1613a(a).[8] Our appellate jurisdiction arises under 48 U.S.C. § 1613a(c).

Alleged *Brady* violations often involve mixed questions of fact and law. In such cases, we review a trial court's factual findings for clear error and its legal conclusions *de novo. Gov't of the V.I. v. Fahie*, 419 F.3d 249, 252 (3d Cir. 2005). However, where, as in this case, the facts from which the alleged violation arises are not in dispute, we conduct our review exclusively under a plenary standard. *Wilson v. Beard*, 589 F.3d 651, 657 (3d Cir. 2009).

---

[8]On January 29, 2007, the Supreme Court of the Virgin Islands assumed the District Court's appellate jurisdiction. *See Hypolite v. People*, 51 V.I. 97, 101 (V.I. 2009) ("The Supreme Court officially assumed appellate jurisdiction over appeals from the Superior Court on January 29, 2007."). However, because Maynard appealed from the Superior Court before the Supreme Court of the Virgin Islands had assumed jurisdiction, his appeal remained with the Appellate Division of the District Court. *See* 48 U.S.C. § 1613a(d) ("The establishment of the [Supreme Court of the Virgin Islands] shall not result in the loss of jurisdiction of the district court over any appeal then pending in it. The rulings of the district court on such appeals may be reviewed in the United States Court of Appeals for the Third Circuit and in the [United States] Supreme Court notwithstanding the establishment of the [Supreme Court of the Virgin Islands].").

## III.  Discussion

*Brady* requires the government to disclose exculpatory evidence with sufficient notice to enable the defendant to use the evidence effectively at trial. *See United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) ("No denial of due process occurs if *Brady* material is disclosed in time for its effective use at trial." (quoting *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983))). To prove a *Brady* violation, the defendant must show that "(1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material." *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004). "Evidence is 'material' where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Simmons v. Beard*, 590 F.3d 223, 234 (3d Cir. 2009) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also United States v. Pelullo (Pelullo I)*, 105 F.3d 117, 123 (3d Cir. 1997) (requiring the defendant to show that the alleged *Brady* violation "resulted in a verdict unworthy of confidence"). However, "the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." *United States v. Pelullo (Pelullo II)*, 399 F.3d 197, 202 (3d Cir. 2005) (quoting *Starusko*, 729 F.2d at 262). A defendant who proves a *Brady* violation is entitled to a new trial. *See Kyles v. Whitley*, 514 U.S.

14

419, 435 (1995) (stating that, when analyzing a *Brady* claim, "once a reviewing court ...

has found constitutional error, there is no need for further harmless-error review").

Maynard contends that the government violated *Brady* by failing to disclose the

identity of the January 1 arrestees and the records of Weeks's drug treatment. We discuss

each of those pieces of evidence in turn.

A.    *Identity of the January 1 Arrestees*

Maynard's first *Brady* challenge is somewhat unusual in that he contends that the

government suppressed the names of the January 1 arrestees even though he received

those names during trial, entered them into evidence, and urged the jury to draw an

inference that one of them was connected to the murder weapon. Thus, Maynard cannot –

and does not – argue that the arrestees' names were exculpatory solely because they

showed that someone other than himself could have possessed the AK-47. Instead,

Maynard argues that the government's failure to disclose the arrestees' identities violated

*Brady* because, had he received their names in advance of trial, he could have

investigated the individuals and potentially shown that one of them actually possessed the

weapon, and perhaps he could even have linked one of them to the murder of Adolph, Sr.

However, defense counsel never spoke with any of the arrestees after learning their

names, even though one month had elapsed between the end of Maynard's trial and the

Court's formal ruling on his *Brady* challenge, nor did he request an extension of time to

conduct such an investigation. We are therefore left to guess whether he could have

15

successfully contacted them and what, if any, information such an investigation might have revealed. Accordingly, and as more fully detailed below, Maynard's *Brady* claim involving the identities of the January 1 arrestees fails.

### 1.    *Suppression by the Government*

The first element of a *Brady* claim requires the defendant to show that the government suppressed evidence. *Lambert*, 387 F.3d at 252. The government's *Brady* obligations attach to all exculpatory evidence in the government's actual or constructive possession. A prosecutor has constructive possession of evidence if, "although [he] has no actual knowledge [of the evidence], [he] should nevertheless have known that the material at issue was in existence." *Pelullo II*, 399 F.3d at 218 n.23 (quoting *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993)). Thus, under *Brady*, the government must "take the minimal steps necessary to acquire ... information" of which the prosecution should be aware, even if it lacks knowledge of the material at the time the defendant requests disclosure. *United States v. Risha*, 445 F.3d 298, 307 (3d Cir. 2006) (quoting *Joseph*, 996 F.2d at 40). The prosecutor's good faith or bad faith in failing to disclose the information is irrelevant. *Arizona v. Youngblood*, 488 U.S. 52, 57 (1988).

Maynard contends that the prosecutor's failure to produce the January 1 arrestees' identities before trial constitutes government suppression of exculpatory evidence, and, contrary to the holdings of the District Court and the Superior Court, the record in this case shows that he is correct. The January 1 arrests were handled by the same police

16

department that investigated the murder of Adolph, Sr., and both matters were referred for

prosecution to the Office of the Attorney General of the Virgin Islands. The prosecutor in

Maynard's case knew that police had apprehended the January 1 arrestees near where they

discovered the AK-47, but the prosecutor failed to perform even the most rudimentary

search for their names. Despite repeated requests by defense counsel, the prosecutor

never reviewed the files associated with the January 1 arrests, nor did he inquire whether

anyone in his office knew the names of the arrestees. Indeed, he was so little concerned

with meeting a clearly relevant disclosure request from the defense that he changed

stories without, it seems, any care at all, saying first that the defense had been given the

names, then that the prosecution itself was without the names, and finally that the

prosecution had the names but that they were never thought to be relevant to Maynard's

case. Under these circumstances, we have little difficulty concluding that the

prosecutor's neglect effectively suppressed the identities of the January 1 arrestees. *See*

*Wilson*, 589 F.3d at 659 (stating that *Brady* requires disclosure of exculpatory

"information in the possession of the prosecutor's office, the police, and others acting on

behalf of the prosecution").

The government advances two unpersuasive arguments against a holding that the

names were suppressed. First, it argues that the arrestees' identities were located in a

separate case file of which the prosecutor had no knowledge. That argument has no merit

because the arrest files were in the possession of the Attorney General's office, and

17

documentation in Maynard's file referred to the six arrestees by arrest number. The prosecutor therefore knew that the names were in the government's possession and knew further where to locate the names, even if he had not yet gone to the trouble to do so. *See United States v. Perdomo*, 929 F.2d 967, 970-71 (3d Cir. 1991) (holding that a prosecutor had constructive knowledge of information held by another arm of the government accessible to the prosecutor).

Second, the government argues that there was no suppression because the prosecutor disclosed the arrestees' names during trial, thereby giving Maynard an opportunity to present their identities to the jury and argue that one of them was tied to the weapon. That argument wrongly presumes that the government is free to dictate the purpose to which the withheld information could be put. Maynard claims that he wanted the names not merely to argue an inference but to be able to investigate a more concrete connection between the January 1 arrestees and the murder of Adolph, Sr. The January 1 arrests meant that six people other than Maynard were possibly linked to the murder weapon, and Maynard hoped that, through his own investigation, he might be able to tie one of them to the weapon or to the murder. That is a legitimate purpose which the prosecutor was not free to frustrate by his cavalier refusal to respond to the defense request for the names of the January 1 arrestees. *Cf. United States v. Higgs*, 713 F.2d 39, 43 (3d Cir. 1983) ("Determining that the requested information falls under *Brady*, however, does not resolve the more difficult question of when that information must be

18

disclosed to appellees. Because *Brady* rests on the requirements of due process, our focus must be on when disclosure is necessary to insure appellees a fair trial."). The government must disclose *Brady* material sufficiently in advance of trial to enable the defendant to use the evidence in a meaningful fashion, and, in this case, the late hour of the government's disclosure prevented Maynard from using the evidence for any investigatory purpose. *Cf. United States v. Lee*, 573 F.3d 155, 164-65 (3d Cir. 2009) (concluding that the government's failure to disclose exculpatory evidence prior to trial under Rule 16 of the Federal Rules of Criminal Procedure prejudiced the defendant because he "was deprived of any opportunity to prepare meaningfully for trial"). Accordingly, we conclude that the prosecutor suppressed evidence and that Maynard has successfully established the first element of a *Brady* violation.

### 2.    *Favorableness and Materiality*

The second and third elements of a *Brady* violation require the defendant to prove that the suppressed evidence was favorable to his defense and material to his case. *Lambert*, 387 F.3d at 252. To be favorable to the defendant, the evidence must either exculpate the accused or impeach a witness for the prosecution. *Wilson*, 589 F.3d at 659. To determine materiality, we evaluate the excluded evidence to assess whether there is a reasonable probability that the outcome would have differed had the jury known of the evidence. *Bagley*, 473 U.S. at 683. "[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the

defense." *Kyles*, 514 U.S. at 436-37. Rather, we must determine whether the non-disclosure is so significant that it "undermines confidence in the outcome of the trial." *Id.* at 434 (quoting *Bagley*, 473 U.S. at 678).

a.    <em>Guiding Principles of Law</em>

We have identified three overriding legal principles that guide our *Brady* analysis. First, *Brady* is not a discovery rule, and it is neither designed nor intended to enable the defendant to present the most effective case possible. *See Wilson*, 589 F.3d at 659 ("The purpose of *Brady* is not to require the prosecution to disclose all possibly favorable evidence to the defense ... ."). Instead, *Brady* establishes a constitutional floor for prosecutorial conduct, requiring the government to provide the defendant, at a minimum, with exculpatory information for the purpose of ensuring that the defendant receives a fair trial. *Starusko*, 729 F.2d at 262. It therefore focuses on safeguarding the defendant's due process rights and regulates prosecutorial conduct only to the extent necessary to protect that right. *Id.* (characterizing *Brady* as a "minimum prosecutorial obligation." (citation omitted)). Thus, non-disclosure alone is not sufficient to form the basis of a successful *Brady* challenge. *See United States v. Brown*, 595 F.3d 498, 509 (3d Cir. 2010) (stating that courts evaluate the merits of an alleged *Brady* violation "irrespective of the good faith or bad faith of the prosecution" (quoting *Brady*, 373 U.S. at 87)). Even suppression resulting from a prosecutor's bad faith or ineptitude does not provide a basis for relief unless the defendant makes an additional showing that the undisclosed evidence is

20

material, i.e., that there is a reasonable probability it will change the outcome of his trial

on remand. *See Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009) ("[E]vidence is 'material' ...

when there is a reasonable possibility that, had the evidence been disclosed, the result of

the proceeding would have been different."); *United States v. Agurs*, 427 U.S. 97, 110

(1976) ("Nor do we believe the constitutional obligation is measured by the moral

culpability, or the willfulness, of the prosecutor.").

Second, a successful *Brady* challenge requires the defendant to show that the

suppressed evidence is either itself admissible or would have directly led to evidence that

would be admissible at a new trial or sentencing. *See Ellsworth v. Warden*, 333 F.3d 1, 5

(1st Cir. 2003) ("[W]e think it plain that evidence itself inadmissible could be so

promising a lead to strong exculpatory evidence that there *could* be no justification for

withholding it."); *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999) ("Inadmissible

evidence may be material if the evidence would have led to admissible evidence.").

Successful *Brady* challenges often seem to rest upon discrete pieces of admissible

evidence that the government effectively withheld. *See, Pelullo I*, 105 F.3d at 122-24

(granting a new trial in a corporate fraud case because a law enforcement officer's notes

corroborated the defendant's theory that allegedly fraudulent money transfers had been

performed for the legitimate purpose of repaying corporate debt); *Perdomo*, 929 F.2d at

970-74 (concluding that government had suppressed a witness's criminal history and

remanding for further fact-finding regarding the materiality of that information).

21

Particularly pertinent here, the Supreme Court has suggested that a defendant may

predicate a *Brady* claim upon prosecutorial suppression that causes the defendant to

"abandon lines of independent investigation, defenses, or trial strategies that [he]

otherwise would have pursued," *Bagley*, 473 U.S. at 683, provided that the defendant

shows that he would have discovered admissible evidence which calls the outcome of the

trial into question. *Id.* at 684.

    Third, a defendant's ability to establish a *Brady* violation by arguing that

suppressed evidence would have led to additional exculpatory materials requires more

than speculation. *See United States v. Aleman*, 548 F.3d 1158, 1164 (8th Cir. 2008)

(rejecting a *Brady* claim based on the government's failure to disclose a witness's

statement that alluded to other individuals who the defendant could have investigated

because the defendant offered nothing more than speculation about what those witnesses

would have said); *United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994) ("We think it

unwise to infer the existence of *Brady* material based upon speculation alone."). The

defendant must instead produce some evidence to show that his investigation would have

borne fruit. *See Agurs*, 427 U.S. at 109-10 ("The mere possibility that an item of

undisclosed information might have helped the defense, or might have affected the

outcome of the trial, does not establish 'materiality' in the constitutional sense."); *Ramos*,

27 F.3d at 71 (requiring a defendant to raise a "colorable claim" showing the existence of

material and exculpatory evidence before granting relief under *Brady* (quoting *United States v. Griffin*, 659 F.2d 932, 939 (9th Cir. 1981))).

The Supreme Court's decision in *Wood v. Bartholomew*, 516 U.S. 1 (1995), illustrates the type of speculation that cannot support a right to relief under *Brady*. In *Bartholomew*, a habeas case brought under 28 U.S.C. § 2254, the defendant was charged with killing a victim during the course of a robbery. The government administered a polygraph test to a critical prosecution witness in which the examiner asked whether the witness had assisted the defendant in preparing for the robbery. *Bartholomew*, 516 U.S. at 4. The witness responded that he had not done so, and "the examiner concluded that the responses ... indicated deception" by the witness. *Id.* The government withheld the results of the polygraph test. The defendant later sought a writ of habeas corpus on the ground that, had he known of the polygraph results, he likely would have sought to depose the witness prior to trial. *Id.* at 4-5. The district court denied relief, but the court of appeals reversed because it believed that the defendant "might well have succeeded in obtaining an admission that [the witness] was lying about his participation in the crime,"[9] which could have been used to impeach the witness or exculpate the defendant. *Id.* at 5. The Supreme Court, however, found that no *Brady* violation had occurred. The Court held that, "[o]ther than expressing a belief that in a deposition [the witness] might have confessed to ... involvement" in the robbery, the theory of the court of appeals about what

---

[9]The polygraph test results were not themselves admissible because state evidentiary laws prohibited their introduction at trial. *Bartholomew*, 516 U.S. at 5.

the witness might have said was "based on mere speculation." *Id.* at 6. The defendant
had failed to produce any evidence to support the possibility that the witness would have
provided exculpatory testimony, *id.*, and it appeared that the challenge was based entirely
on information that the defendant hoped to find, not on a showing that such evidence was
available and accessible to him.

    *Bartholomew* thus demonstrates that a defendant may not rest a *Brady* claim on the
mere hope that he will discover exculpatory information. *Id.* (stating that the court of
appeals's "judgment [wa]s based on mere speculation, in violation of the standards we
have established" under *Brady*). Instead, he must make a concrete showing that he has a
fair probability of discovering such evidence. *See Aleman*, 548 F.3d at 1164 (concluding
that conjecture about what witnesses might have said cannot support a *Brady* claim).

    We too have rejected conjecture as a basis for a *Brady* challenge. We have refused
relief to a defendant who speculated that preliminary investigation notes destroyed by law
enforcement officers might have contained unspecified *Brady* materials. *Ramos*, 27 F.3d
at 71. We have also found *Brady* claims to be insufficient when based on the
government's failure to disclose evidence that, due to the location and condition of
discovery, could only be linked to the case through conjecture. *Lambert*, 387 F.3d at 264
(concluding that no *Brady* violation occurred when police were searching for a pair of
sneakers discarded in a river but found a partly decayed sneaker on the riverbank because
the sneaker appeared to be too old to be connected to the case, and therefore any link to

the crime was purely speculative), or when based on unsupported guesswork regarding

information that the government might have had in its files, *United States v. Am. Radiator*

*& Standard Sanitary Corp.*, 433 F.2d 174, 202 (3d Cir. 1970).

Together, these three guiding principles – (1) that the government's failure to

disclose does not by itself support a *Brady* claim, (2) that the defendant must point to

materials that are admissible or that would have led to admissible evidence, and (3) that

the defendant may not rest his claim on pure conjecture – reveal that, at its core, *Brady*

requires a showing of prejudice. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004)

(describing *Brady*'s materiality element as equivalent to a showing of prejudice). The

defendant must identify evidence raising a reasonable probability that, were we to remand

for a new trial or sentencing, the new proceeding would have a different outcome than the

one that occurred in the first instance.

> b.    *Maynard's Speculation about Exculpatory, Material Evidence*

Applying those principles to this appeal, we conclude that Maynard has not moved

his *Brady* challenge beyond the realm of conjecture. Maynard rests heavily upon the

prosecutor's misconduct to substantiate his claim to relief, and he notes that the

prosecutor's failure to discover and disclose the arrestees' identities reflects a refusal to

take seriously the obligations imposed by *Brady*. Maynard repeatedly requested the

arrestees' identities, and the prosecutor represented that the government lacked such

information, even though there had been no effort to review the files associated with the January 1 arrests.

To be sure, the manner in which the prosecutor approached his responsibilities in Maynard's case deserves, at a minimum, the most unequivocal rebuke, and both the Superior Court and the Appellate Division appropriately took him to task for his lack of professionalism. Since he appears to be a repeat offender,[10] the Superior Court in particular expressed an understandable inclination to punish him, but that does not mean

---

[10]The prosecutor's failure to disclose the information prompted the Superior Court to say:

> [Y]ou can't walk into court at the last minute and produce information that you should have produced, that the defendant asked specifically for on four different occasions, in front of me, at least, and you get up and say you didn't have it.
>
> Your problem is that you cavalierly deal with these cases as if it doesn't matter. You don't have it or produce it, and that's it. You don't seem like you think that you have to investigate.
>
> Any other officer in your department, whatever they have, you have. And I'm getting tired of you, in particular, of these last minute, producing things.
>
> And this is a situation where the defendant has asked you over and over and over, and you get up and say, "Judge, we gave all we have. That's it."
>
> And then in the middle of the trial you're going to produce a document that has the names of people that this defendant could have investigated, who might have some connection to the very gun that was used ... , and the Court is just supposed to close its eyes to it and proceed.

(App. at 293-94.) Like the Superior Court, the Appellate Division indicated that it did not condone the prosecutor's "lackadaisical and cavalier approach to discovery," (*id.* at 40), and that it had "serious doubts that the prosecutor ... complied with" his discovery obligations. (*Id.* at 41.)

that a *Brady* claim is well-founded. Maynard is free to file an ethical grievance against

the prosecutor with the Supreme Court of the Virgin Islands or with the Virgin Islands

Bar Association. *See* V.I. S. CT. R. 203(f) (establishing procedures for disciplinary

complaints against attorneys); V.I. S. CT. R. 205 (creating the Virgin Islands Bar

Association and giving it authority to regulate the practice of law). He may also petition

for habeas relief, though we of course make no comment on whether such a petition

would have merit. In addition, the circumstances of this case should, we think, prompt

the Attorney General of the Virgin Islands to take remedial action to ensure that this

prosecutor in particular understands and acts upon the scope of his disclosure obligations,

including the obligations that flow from *Brady*.

Regardless of what ought to be done in disciplining the prosecutor, however, it still

remains that *Brady* is not violated every time the government withholds information from

a defendant. *United States v. Veksler*, 62 F.3d 544, 550 (3d Cir. 1995) ("[N]ot every

failure to disclose evidence favorable to the defense requires a reversal of a conviction.").

*Brady* requires vacatur of the conviction only if the withheld evidence undermines

confidence in the integrity of the verdict. *See Dist. Atty's Office for the Third Judicial

Dist. v. Osborne*, 129 S. Ct. 2308, 2335 (2009) ("[T]he [government] violates due process

when it suppresses 'evidence favorable to an accused' that is 'material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution.'" (quoting

*Brady*, 373 U.S. at 87)). We must therefore consider whether Maynard suffered prejudice

as a result of the prosecutor's neglect. In other words, we must determine whether Maynard has identified exculpatory evidence sufficient to raise a reasonable probability that his trial or sentence would have been different had the evidence been presented in court. *Bagley*, 473 U.S. at 682. Our review shows that he has not.

Insofar as the names of the January 1 arrestees were themselves exculpatory, Maynard presented them to the jury and urged jurors to conclude that one of the arrestees was linked to the weapon or to the murder. During closing arguments, Maynard's counsel suggested that the names "show[ed] that somebody else, other than Kenrick Maynard, possessed the firearm that shot Adolph Hyman, ... Sr." (App. at 546-47.) Thus, Maynard had and took the opportunity to link other individuals to the murder weapon using the identities of the January 1 arrestees.

As to whether the government's suppression of the arrestees' names deprived Maynard of evidence that he could have collected before trial to link one of the arrestees to the AK-47 or to the murder, the decision is less clear, but ultimately we conclude that Maynard has failed to show that the names would have directly led to the discovery of such evidence. He has not shown that he could have located the January 1 arrestees, much less that they possessed information that would have altered the outcome of his trial. The arrests occurred over six months after Adolph, Sr.'s death, and no evidence of record suggests that any of the arrestees ever possessed the murder weapon at any time.

28

Indeed, the arrestees were released from custody because the government could not link
them to the gun in any way.

Like the defendant in *Wood*, Maynard has predicated his *Brady* arguments not on
an evidentiary showing that he could have obtained exculpatory information from the
arrestees but on a mere hope that he would have done so. His challenge rests entirely
upon the assumption that he could have located the arrestees, that one of them knew about
and would have been willing to speak with him about the weapons, and that the
conversation would have given him information that shed new light on who used the AK-
47 six months earlier, when Adolph, Sr. was killed. We should not make such speculative
leaps without some evidentiary footing, and Maynard has given us nothing of the kind.

Maynard had the opportunity to seek out the January 1 arrestees pending the
Superior Court's disposition of his *Brady* motion following trial. However, even though
he had their names and time to look for them, he never undertook the investigation that he
had so zealously claimed was essential to his defense. If he thought he lacked the amount
of time necessary for an investigation, he could have requested a continuance, but he did
not do so. In short, he had the chance to move his *Brady* challenge beyond the realm of
conjecture but neglected to do so. *See Pelullo II*, 399 F.3d at 209 (imposing burden of
establishing a *Brady* challenge upon the defendant).

One final point convinces us that denying relief on the *Brady* claim pertaining to
the January 1 arrestees is appropriate, namely, the weight of evidence against Maynard.

*See Bartholomew*, 516 U.S. at 8 (considering the strength of the government's case when evaluating materiality under *Brady*). Both Adolph, Jr. and Weeks testified that they were acquainted with Maynard prior to the shooting of Adolph, Sr. Both testified that they saw him firing the weapon that killed Adolph, Sr., and they described in detail their opportunity to witness the murder. They both positively identified Maynard at trial. Neither of them expressed uncertainty about his culpability at any point during pretrial investigation or questioning at trial. Jurors also heard testimony that the six arrestees were apprehended at the time the AK-47 was discovered, and Maynard encouraged them to draw an inference that one of these six individuals was linked to the weapon or was responsible for the murder. Jurors nevertheless found Adolph, Jr. and Weeks's account of the murder to be credible. We will not second-guess that finding of credibility. *United States v. Ozcelik*, 527 F.3d 88, 94 (3d Cir. 2008) ("We must 'defer to the jury's assessment of witness credibility' and recognize that 'the government's proof need not exclude every possible hypothesis of innocence.'" (quoting *United States v. Bala*, 236 F.3d 87, 93-94 (2d Cir. 2000))).

Furthermore, Maynard fled the Virgin Islands immediately after the shooting of Adolph, Sr., supposedly to escape the individuals who had attacked him on July 4, 1999, but whom he could not identify. He never indicated why the attack threatened him so severely that he moved 1,500 miles away, nor has he explained why he changed his identity. He asked jurors to believe that he upended his entire life based on a single

30

incident perpetrated by individuals he did not know and for reasons he did not understand. The jury rejected that explanation and, on this record, we are in no position to disagree. *See United States v. Green*, 25 F.3d 206, 210 (3d Cir. 1994) ("[E]vidence of a defendant's flight after a crime has been committed is admissible to prove his consciousness of guilt.").

In sum, Maynard's conjecture about what an investigation of the January 1 arrestees might have shown is insufficient to demonstrate that an investigation would have led to evidence that was exculpatory and material to his defense. Accordingly, the Appellate Division was correct to affirm the Superior Court's denial of Maynard's *Brady* claim with respect to the arrestees' identities.[11]

B.    *Medical Records of Weeks's Drug Use*

Maynard alleges that the government violated *Brady* by failing to obtain and produce evidence of Weeks's drug use in the possession of the Department of Health. Assuming that Weeks's treatment records qualified as *Brady* materials, they nevertheless

---

[11]One might argue that the denial of Maynard's *Brady* challenge will create an incentive for prosecutors to withhold the names of key witnesses or other individuals who possess evidence pertinent to a case. That concern is, we hope, unfounded. The Supreme Court has noted that "because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Agurs*, 427 U.S. at 108. A sensible prosecutor has no incentive to withhold the names of potential witnesses because, in doing so, the prosecutor creates a risk that the defendant will later establish that those witnesses possessed material and exculpatory information. Although that risk did not materialize in this case, rejecting Maynard's *Brady* challenge does not mean that another defendant in a similar position would be unable to advance a meritorious *Brady* challenge.

fail to support a claim to relief because Maynard could have discovered them through the exercise of reasonable diligence. *Pelullo II*, 399 F.3d at 202 ("[T]he government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." (quoting *Starusko*, 729 F.2d at 262)). After the prosecutor allegedly tried and failed in his attempt to obtain those records from the Department of Health, defense counsel subpoenaed them on the first day of trial. The Department promptly brought the records to the courthouse the following day, but it was too late for defense counsel to put them in evidence.

These circumstances, though unfortunate, demonstrate that Maynard could have obtained the records prior to trial. Defense counsel was aware two weeks before trial that a court order would be necessary to acquire the records, but he did not subpoena them until after trial commenced. *See United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985) (concluding no *Brady* violation because the defendant could have subpoenaed a videotape allegedly withheld by the government from the witness who had custody of it); *see also Perdomo*, 929 F.2d at 973 ("*Brady* does not oblige the government to provide defendants with evidence that they could obtain from other sources ... ."). Because Maynard's counsel could have obtained the records prior to trial through the exercise of reasonable diligence, those records cannot serve as the basis for relief under *Brady*. Accordingly, Maynard is not entitled to a new trial based on the government's failure to obtain and produce records of Weeks's drug treatment.

## IV.   Conclusion

Though we do not entirely agree with the reasoning provided by the Appellate Division, the Court was correct in its conclusion that neither the suppression of the January 1 arrestees' identities nor the government's failure to obtain and produce Weeks's drug treatment records provides a basis for relief under *Brady*.  Thus, the Court properly affirmed the Superior Court's denial of Maynard's post-trial motion.  We will therefore affirm the judgment of the Appellate Division of the District Court.